COURT OF APPEALS OF VIRGINIA

Present: Judges Alston, O'Brien and Senior Judge Clements
Argued at Alexandria, Virginia

CHARLES STANARD SEVERANCE

                                                          OPINION BY
v.      Record No. 0308-16-4                    JUDGE MARY GRACE O'BRIEN
                                                          MAY 23, 2017

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

James W. Hundley (Erin L. Blanch; BrigliaHundley, P.C., on briefs),
for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Following a jury trial, Charles Stanard Severance ("appellant") was convicted of two counts

of capital murder for the deaths of Ronald Kirby and Ruthanne Lodato, one count of first-degree

murder for the death of Nancy Dunning, and other related charges. Prior to trial, appellant moved to

sever the charges relating to the Dunning murder from the other offenses. Following a hearing, the

court denied the motion.[1] Trial was held October 8 through November 2, 2015. The court imposed

the jury's verdict of three life sentences for the murder convictions, and forty-eight years of

incarceration for the other related charges. This appeal followed.

Appellant asserts three assignments of error:

    I.    The trial court erred in denying [appellant's] motion to sever
          the Dunning case from the Lodato and Kirby cases.

---

[1] Justice Jane Marum Roush ruled on the motion to sever before her appointment to the
Supreme Court. Judge Bellows presided over the trial.

II.      The trial court erred in denying [appellant's] motion to strike the evidence.

III.    The trial court erred in sentencing [appellant] for both capital murder convictions.

BACKGROUND

Factual Background

We consider the evidence in the light most favorable to the prevailing party, the Commonwealth. Beasley v. Commonwealth, 60 Va. App. 381, 391, 728 S.E.2d 499, 504 (2012). So viewed, the evidence established that appellant graduated from college in 1986 with a degree in mechanical engineering. Following graduation, he was employed sporadically due to difficulties with employers. Appellant's family began to notice that he was acting erratically in 1988, but he never received significant mental health treatment.

Appellant began a relationship with Tamela Nichols in 1998. The parties resided together in Alexandria and had a child, Levi, who was born in April 1999. Issues arose between appellant and Nichols in March 2000, and Nichols moved out with Levi. A number of contentious custody and visitation hearings in the Alexandria Juvenile and Domestic Relations District Court ensued. Ultimately, Nichols was granted sole legal and physical custody and no visitation was awarded to appellant. The custody orders were served on appellant and were signed by various deputies "for Sheriff Dunning." Following the proceedings, Nichols received threatening letters from appellant.

Witnesses testified that for years after the custody proceedings, appellant became upset and irrational when the subject arose. He would quickly become argumentative and denounce the police and the "enforcement class." Appellant was illogical when discussing the issue; he used repetitive phrases such as "tomahawking the homestead."[2] Appellant's family was concerned about his

_____

[2] Appellant's girlfriend testified that to appellant, "tomahawking the homestead" meant that "you would protect your homestead. So if there was a threat to you or your family, well, you were entitled to kill those people."

- 2 -

mental health, but appellant was distrustful of the mental health system. He became irate when he learned that his parents had attended meetings of an organization that assisted parents with children suffering from mental health disorders. Appellant ran for mayor of Alexandria in 1996, and his platform included a condemnation of mental health institutions.

Murder of Nancy Dunning: December 5, 2003

Nancy Dunning was a well-known real estate agent who lived in Alexandria. She was married to James Dunning, the sheriff of Alexandria who had held that position since 1985. Mrs. Dunning made plans to meet her husband and son for lunch on December 5, and they became concerned when she did not arrive. She had told her son that she was going to stop at Target before meeting them. Her son drove to the Dunning residence and noticed that the garage door was open and his mother's car, which displayed a sheriff's license plate, was in the garage. He went inside the residence, saw the bags from Target in the family room, and found his mother lying in the front hallway, unresponsive, with blood on her face. The front door was closed but unlocked, and nothing was out of place or missing from the residence. Crime scene investigators found no evidence of forced entry. A small caliber bullet was discovered in a pool of blood near the victim and a blood smear was located on the front door.

At trial, the Commonwealth presented surveillance footage that depicted a man who appeared to be following Dunning at the Target store where she shopped before her death. However, a number of appellant's witnesses testified that the man in the video was not appellant.

Dr. Carolyn Revercomb, a medical examiner, performed the autopsy on Dunning. She found three gunshot wounds, and a fourth abrasion on the victim's chest that she characterized as a "bullet slap wound." Dr. Revercomb opined that the "bullet slap wound" could have resulted from a gunshot through the victim's arm that did not penetrate her chest. She noted that the bullet found

at the scene may have caused that injury. Dr. Revercomb testified that the gun barrel was "quite close" to the victim when she was shot.

Murder of Ronald Kirby: November 11, 2013

Ronald Kirby, the Director of Transportation Planning for suburban Maryland, the District of Columbia, and Virginia, lived with his wife in Alexandria, Virginia. He was at home on November 11 waiting for a plumber to arrive. Daniel Petrillo, the plumber, testified that he spoke to Kirby by telephone at 11:32 a.m. and advised him that he was on his way to Kirby's residence. When Petrillo arrived at 11:42 a.m., no one answered the door. He unsuccessfully attempted to reach Kirby by telephone and left shortly after noon.

Petrillo testified that on his way to the Kirby residence he noticed a construction crew working on curbs and concrete. The crew was composed of Hispanic men, but Petrillo noticed one white man who "stuck out" walking down the street. The man was wearing a faded flannel shirt, and resembled appellant. Petrillo stated that he was "eighty percent sure" the person he saw was appellant.

Kirby's son testified that he went to his father's residence that day and found the front door closed but unlocked. He called 911 when he discovered his father lying on his back near the door. Emergency personnel arrived at approximately 12:30 p.m. and found gunshot wounds to Kirby's chest. Bullets and bullet fragments were recovered from the scene. The crime scene investigator testified that there were no signs of forced entry, nothing was disturbed at the scene, and Kirby's wallet, watch, and wedding ring, which were on his body, were not taken.

Dr. Jocelyn Posthumus, the medical examiner who performed the autopsy, testified that Kirby died as a result of gunshot wounds to his chest. She recovered three bullets from his body, two from his chest and one from his left hip. Dr. Posthumus also identified two gunshot wounds to Kirby's right hand. Because two other bullets were found at the scene, Dr. Posthumus opined that

five bullets had been fired, from a distance of more than two or three feet. She testified that she has performed more than three hundred autopsies of shooting victims but this is the only case in which a .22 caliber long-rifle round was used in the shooting.

Murder of Ruthanne Lodato and Malicious Wounding of Janet Franko

Ruthanne Lodato, the sister of an Alexandria General District Court judge and the daughter of an Alexandria Circuit Court judge, lived with her husband and mother in Alexandria. Janet Franko worked at the residence as a caretaker for Lodato's mother. At 11:30 a.m. on February 6, 2014, Franko heard the doorbell ring and "a boom" followed by a scream. Franko testified that she ran to the door and encountered a bearded white man, who was fifty to sixty years of age. She saw the man holding something round from his sleeve, heard another "boom," and felt a hard pain as she was shot in the arm. Franko ran out of the back door and told a neighbor to call 911.

Franko was taken to the emergency room and the following day, she helped a police officer prepare a sketch of the man who shot her. She subsequently identified appellant from a photo array as "look[ing] like" her assailant, except for the amount of hair on his face. At trial, she testified that she was certain appellant was the man who shot her.

Officer Jonattan Lopez, who responded to the scene, testified that he found Lodato lying on the floor. She told the officer that she didn't know the person who shot her, but he was an older white male with a gray beard. Crime scene investigation revealed no sign of forced entry and nothing stolen from the house. Two intact bullets were recovered from the scene.

Dr. Nikki Mourtzinos, a medical examiner, testified that she performed the autopsy on Lodato, who died as a result of the gunshot wounds. Mourtzinos stated that one entrance wound was "quite small," which indicated that it was made by a small caliber weapon, typically a .22 caliber. She testified that she had performed a "few hundred" autopsies and only a "handful of cases" involved .22 caliber weapons.

Marlene Wahowiak, a neighbor of the Lodatos, contacted the police the day after the shooting. She told them that during the weeks preceding the murder, she had seen a man in the area on multiple occasions with a "full gray beard [and] messy hair" who "looked out of place," because he wasn't dressed appropriately for the weather. When the police released the composite sketch made from Franko's description, Wahowiak immediately advised them that the sketch depicted the man she had seen in the neighborhood. She also identified appellant in court as the man she observed near the Lodato residence.

Susana Marquez testified that she was driving in Alexandria a few blocks from the Lodato residence on February 6, 2014, when she noticed an approaching car that was driving very quickly and ignored a stop sign. She stated that the car was "red/orange" and identified appellant as the driver. At the time of the murder, appellant drove a 1999 red Ford Escort station wagon with a bumper sticker that said "Assassination City Derby." When shown a picture of appellant's car, Marquez identified it as the one she observed on February 6.

Additionally, residents of a home on West Braddock Road, less than half a mile from the Lodato home, had surveillance cameras which showed appellant's car being driven at 11:29 a.m. on February 6, 2014.

Appellant's Arrest

At a press conference on March 6, 2014, the Alexandria police chief announced that ballistics testing demonstrated "a definitive link" between the Dunning, Kirby, and Lodato homicides. He also advised that a small caliber handgun was used in each of the killings. That same day, an Alexandria police department investigator attempted to contact appellant. He spoke to appellant's girlfriend, Linda Robra, and asked her to have appellant contact him.

On March 7, appellant went to the Russian Embassy, where he said that he was seeking asylum. He told Secret Service agents who approached him that "he had been persecuted by the

- 6 -

City of Alexandria for the last dozen years" and the police "were trying to get revenge on him for running for mayor." The Secret Service agents escorted appellant to his car, photographed the vehicle, and gave the photographs to Alexandria detectives. The detectives recognized appellant's car as the same vehicle that appeared in the surveillance video driving on West Braddock Road following the Lodato murder.

Severance returned to Robra's residence and told her that instead of contacting the police, he was going camping. At that point, she told him to "pack all of his things and not come back." Appellant left on March 10, 2014. The police executed a search warrant on Robra's residence on March 12, 2014. Appellant had lived with Robra since 2011. Appellant often spoke to her about being treated unfairly by the Alexandria court system during his custody case and mentioned killing judges, police officers, and their families.

Robra testified that appellant suggested she buy two .22 caliber North American Arms revolvers in 2012. He told her that he couldn't possess guns because of a prior felony conviction, but he had owned a .22 caliber North American Arms revolver in the past. At appellant's direction, Robra also bought Remington .22 low velocity, subsonic ammunition. She realized that the weapons and ammunition were missing after appellant left her residence on March 10. When the search warrant was executed, police found two Remington .22 caliber shell cases on the garage floor, but Robra did not know how they got there. She testified that she never fired the revolvers.

During a search of appellant's parents' home, police recovered a box of Remington .22 long-rifle plain lead hollow point subsonic ammunition in an area of the home where appellant stored his possessions. Forty rounds of ammunition were found in the fifty-round capacity box. The parties stipulated that appellant's parents had not purchased the ammunition and were unaware of its presence in their home.

Appellant was arrested on March 13, 2014, in Wheeling, West Virginia.  At the time of his arrest, appellant's vehicle contained a gun cleaning kit, his passport, various items of clothing, two bags of latex gloves, and approximately $1700 in cash.

Ballistics Testimony

At trial, Ken Friel, the general manager of North American Arms, a gun manufacturer, explained that the company's .22 caliber long-rifle five-shot mini revolver is designed for self-defense and is easily concealed.  He testified that North American Arms is the only manufacturer that produces a five-shot mini revolver with eight lands and grooves and a twist to the right.

Virginia State Trooper John Foster Murphy testified that he stopped appellant for a traffic violation on February 25, 2004.  Due to appellant's "odd" demeanor and what appeared to be partially concealed weapons, Trooper Murphy searched the vehicle and recovered three handguns, including a North American Arms .22 caliber revolver.  Trooper Murphy testified that the gun was "a very unique weapon that [he had] never come across personally."  Based on appellant's prior conviction for possession of a concealed weapon, the trooper charged him with felony possession of a concealed weapon.  Appellant was convicted of that charge, and the gun was destroyed.

Three firearm experts from the Virginia Department of Forensic Science testified at trial. Julien Mason, who had been employed for thirty-four years as a firearm and tool mark analyst, has performed more than 5,400 firearm examinations.  He explained that if he has two bullets to compare, he often can determine if the bullets were fired from the same firearm.  He draws his conclusion by comparing calibers, number of lands and grooves and twist and individual microscopic characteristics that are "imparted by the firearm at the time of firing."

Mason examined the projectiles from all three crime scenes.  He determined that the bullets recovered from the Dunning murder scene were Remington .22 long-rifle bullets that were plain

lead, round-nose, and hollow point. The bullets were fired from a firearm having eight lands and grooves with a right twist and were "very unusual." He concluded that one North American Arms .22 caliber long-rifle revolver with five shots could have produced the rifling impressions that he saw on the bullets. Mason determined that the bullets recovered from the Kirby murder also had eight lands and grooves with a right twist and could have been fired from a North American Arms .22 caliber long-rifle revolver. Likewise, in the Lodato murder, the recovered bullets were Remington .22 long-rifle plain lead hollow point bullets with eight lands and grooves with a right twist. Mason concluded that the bullets could have been fired from a North American Arms .22 caliber long-rifle revolver.

Mason testified that although all of the bullets from the three crime scenes appeared to be .22 caliber long-rifle Remington hollow point cyclone or subsonic ammunition, the microscopic markings were different, which indicated that the bullets were fired from three different handguns. He stated that three separate North American Arms long-rifle five-shot revolvers could account for all of the ballistics evidence. He also testified that in his thirty-four-year career as a firearm analyst, he had seen this type of ammunition only three times – in the three murders involved in this case.

Likewise, Gary Arntsen, a firearm analyst who has performed 3,615 firearm and ammunition examinations in his career, testified that he is familiar with Remington .22 caliber long-rifle plain lead hollow point cyclone or subsonic ammunition. However, he has only seen that type of ammunition on three occasions – the three murders in this case. Ann Davis, a third firearm and tool mark examiner, who had been employed by the Department of Forensic Science for thirty years, also stated that she was familiar with Remington .22 cyclonic and subsonic ammunition, but did not "personally recall seeing it ever."

Additional Trial Evidence

Detective David Cutting testified that the residential area where the crimes occurred has very little violent crime and therefore, the three murders were unusual. The detective used a map to show that the murders all took place within a few miles of each other. Appellant lived approximately two miles from Nancy Dunning at the time she was killed. Detective Cutting also testified that there were no other murders in Alexandria with a similar method of operation after appellant was apprehended.

Law enforcement officials recovered over two thousand pages of letters, e-mails, and journal entries written by appellant. The Commonwealth introduced excerpts at trial that included the following statements: "[i]ntroduce murder into a safe and secure neighborhood. It shutters [sic] with horror. Do it again and again and again." Appellant also made comments about firearms in one of his journals:

> Levite, my son, please purchase three North American Firearms, .22 mini revolver and 500 rounds of Subsonic low-velocity cartridges. The five-round stainless steel with wooden grip revolver is small and easily concealed. Thou shalt murder, and vengeance is mine, saith the Lord. Hollow-point at below the speed of sound is sweet music and very, very effective . . . [v]iolence wins.
>
> . . . .
>
> North American Firearms out of Utah makes a beautiful, tiny and deadly .22 mini revolver, five-cartridge, stainless steel, Mormon death squad special. Best to discharge subsonic less-than-speed-of-sound ammunition. Don't damage gun with high-velocity, high-energy rounds.

Another journal entry contained the following statement: "Wisdom. Knock, talk, enter, kill, exit, murder wisdom."

ANALYSIS

A.  Assignment of Error 1:  Joinder

Appellant contends the trial court erred in denying his motion to sever the Dunning murder trial from the Kirby and Lodato cases.[3]  "Whether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court.  Thus, a trial court's ruling on the matter will not be reversed absent a showing that the court abused its discretion."  Cheng v. Commonwealth, 240 Va. 26, 33-34, 393 S.E.2d 599, 603 (1990) (citation omitted); see also Walker v. Commonwealth, 289 Va. 410, 415, 770 S.E.2d 197, 199 (2015).

Rule 3A:10(c) allows cases to be joined for trial if "the accused and the Commonwealth's attorney consent" or "if justice does not require separate trials and . . . the offenses meet the requirements of Rule 3A:6(b)."  Rule 3A:6(b) states:

> [t]wo or more offenses, any of which may be a felony or
> misdemeanor, may be charged in separate counts of an indictment
> or information if the offenses are based on the same act or
> transaction, or on two or more acts or transactions that are
> connected or constitute parts of a common scheme or plan.

Therefore, if a defendant does not consent to joinder, the Commonwealth must establish that the offenses were either part of the same act or transaction, or were part of a common scheme or plan and justice does not require separate trials.  See Scott v. Commonwealth, 274 Va. 636, 644, 651 S.E.2d 630, 634-35 (2007).

Here, the Commonwealth does not contend that the three murders were part of the same act or transaction, but asserts that they were part of a common scheme or plan and therefore, joinder was appropriate.  Appellant asserts that any similarities in the three murders were not sufficiently "idiosyncratic" to warrant the conclusion that the same person committed the crimes, so they were not part of a common scheme.  Appellant also argues that the murders were not part of a common

---

[3] Appellant did not object to the court trying the Kirby and Lodato cases together.

- 11 -

plan because they were not "related to one another for the purpose of accomplishing a particular goal." Scott, 274 Va. at 646, 651 S.E.2d at 635. Finally, he contends that justice required that the Dunning charges be tried separately. We disagree.

In Scott, the Court defined the terms "common scheme" and "common plan" in the context of joinder:

> The term "common scheme" describes crimes that share features idiosyncratic in character, which permit an inference that each individual offense was committed by the same person or persons as part of a pattern of criminal activity involving certain identified crimes. . . . In contrast, the term "common plan" describes crimes that are related to one another for the purpose of accomplishing a particular goal.

274 Va. at 645-46, 651 S.E.2d at 635. While the Court noted that the terms are not synonymous, it also found that they are not mutually exclusive and "a series of crimes may exhibit both a 'common scheme' and a 'common plan.'" Id. at 646, 651 S.E.2d at 635-36.

In Scott, the trial court erred in allowing a joint trial for nine robberies of different victims at various locations during a four-month period. Id. at 647-48, 651 S.E.2d at 636. On appeal, the Court noted that there was no evidence that the robberies were connected by "a weapon of the same description . . . unusual threatening remarks, or . . . victims only of a certain gender or age group." Id. at 647, 651 S.E.2d at 636. The Court found that the evidence did not establish that the crimes were distinctive enough to be classified as part of a "common scheme." Id. at 646, 651 S.E.2d at 636.

Likewise, the Court did not find any evidence of a common plan, and noted that "the evidence completely lacked any proof that the offenses were related to one another for the purpose of accomplishing a particular goal." Id. at 647, 651 S.E.2d at 636. See also Walker, 289 Va. at 416, 770 S.E.2d at 199 (four charges of cocaine distribution in a thirteen-day period insufficient to establish a common plan "showing that each offense was intended to assist in accomplishing a goal

- 12 -

other than that achieved by an individual offense" (quoting Spence v. Commonwealth, 12 Va. App. 1040, 1044-45, 407 S.E.2d 916, 918 (1991))).

The record supports the conclusion that due to the idiosyncratic character of the evidence in this case, the court did not err in ruling that there was sufficient evidence of a common scheme. The three murders occurred within a mile and a half of each other in a low-crime residential area, where murder was unusual. Each homicide took place in the late morning of a weekday and the victims were all found shot near their front doors. There was no evidence in any case of a robbery or break-in and although money and jewelry were easily accessible, nothing was taken.

The distinctive weapons and ammunition used in the three cases were also significant. Expert testimony established that the victims were all shot by a .22 caliber firearm with eight lands and grooves with a right twist that held five bullets. The ammunition in each case was either cyclonic or subsonic Remington long-rifle plain lead hollow point bullets. The three firearm experts testified that they had only seen this particular ammunition three times: in the Dunning, Kirby, and Lodato murders. "[T]he possible range of idiosyncratic features that may establish a 'common scheme' is very broad." Scott, 274 Va. at 647, 651 S.E.2d at 636. The similarities between the three murders were sufficient to establish that they were committed as part of a common scheme.

Additionally, we find that the court did not err in concluding that the three murders were also committed as part of a common plan. A common plan is established "when the constituent offenses occur sequentially or interdependently to advance some common, extrinsic objective." Walker, 289 Va. at 418, 770 S.E.2d at 201. Here, as the trial court noted, appellant's "extrinsic objective" was to "exact revenge on the elites of the City of Alexandria because of his deep anger over his loss of the custody of his child."

Evidence established that after appellant lost custody of his son in 2000, he blamed police officers, judges, and the "ruling elite." Friends and family members testified that his rage was

unabated during the fourteen years before his arrest. His writings expressed anger against Alexandria officials, including comments such as "[a]ssassinate . . . Family vendetta will settle the score after the kangaroo court . . . [k]ill all the local cops and murder all members of the enforcement class." The three victims were prominent citizens of Alexandria; each murder was not an act committed in isolation, but part of a plan of retaliation against people appellant considered part of "the establishment class." The murders were separate expressions of a general plan.

Appellant also asserts that even if the evidence showed a common scheme or plan, justice mandated separate trials. "Justice often requires separate trials where highly prejudicial evidence of one of the crimes is not admissible in the trial of the other." Long v. Commonwealth, 20 Va. App. 223, 226, 456 S.E.2d 138, 139 (1995). It was the court's duty to determine whether evidence of the Dunning murder would have been admissible in the trial for the other two homicides. The court ruled that evidence from the Dunning murder would have been admissible to establish the identity of the perpetrator in the Kirby and Lodato cases. See Spencer v. Commonwealth, 240 Va. 78, 89, 393 S.E.2d 609, 616 (1990) (other crime evidence may be admissible to prove criminal agency or identity). Additionally, pursuant to Virginia Rule of Evidence 2:404(b), the evidence would have been admissible to show a common scheme or plan. Accordingly, the court did not err in finding that justice did not require separate trials.

### B. Assignment of Error 2: Sufficiency of the Evidence

Appellant asserts that the court erred in denying his motion to strike "for insufficiency of the evidence." When the sufficiency of the evidence to support a conviction is challenged on appeal, we must view the evidence in the light most favorable to the Commonwealth, the prevailing party at trial. Kelly v. Commonwealth, 41 Va. App. 250, 254, 584 S.E.2d 444, 446 (2003) (en banc). "If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment." Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998).

"Therefore, under this highly deferential standard of review on appeal, '[t]he judgment of the trial court is presumed to be correct and will be reversed only upon a showing that it is "plainly wrong or without evidence to support it."'" Ervin v. Commonwealth, 57 Va. App. 495, 503, 704 S.E.2d 135, 139 (2011) (*en banc*) (quoting Viney v. Commonwealth, 269 Va. 296, 299, 609 S.E.2d 26, 28 (2005)).

The sole issue in the three murders was the identity of the perpetrator. In his assignment of error, appellant reiterates his argument that the Dunning murder should have been tried separately. However, for the reasons stated above, we find that the crimes were sufficiently similar and idiosyncratic to establish an inference that the same person committed all three murders.

Further, appellant's convictions are supported by both direct and circumstantial evidence. In the Lodato case, Franko identified appellant as the man who shot her. She confronted him at the front door immediately after he shot Lodato. Wahowiak recognized appellant in the area near the Lodato house several times in the weeks preceding the murder, and Marquez testified that she saw appellant driving erratically out of Lodato's neighborhood shortly after the shooting. Appellant's distinctive vehicle was depicted close to the crime scene on a surveillance video taken shortly after the murder occurred.

Petrillo identified a man resembling appellant near the Kirby residence around the time that Kirby was killed. Petrillo explained why he noticed the man and testified at trial that he was "eighty percent sure" the person he saw that day was appellant.

In the Dunning murder, appellant notes that there is no eyewitness testimony connecting him to the crime scene. He contends that because he presented evidence that the man shown following Dunning on the Target surveillance video was not him, the evidence was insufficient to support a conviction. However, we note that as in all cases, credibility of the witnesses is a matter solely for the finder of fact, who has the opportunity to observe the witnesses testify. Elliott v.

- 15 -

Commonwealth, 277 Va. 457, 462, 675 S.E.2d 178, 181 (2009).  The jury was free to reject the defense evidence and reach a different conclusion.  Additionally, the jury could have found that appellant committed the crime even if he was not the person depicted in the Target surveillance video.  The question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

The Commonwealth presented significant circumstantial evidence to establish appellant's guilt.  In addition to the ballistics links between the crimes, Robra's .22 caliber North American Arms revolvers, weapons identified as potential sources of the fatal shots, were missing after appellant left her residence.  Appellant appeared at the Russian embassy seeking asylum the day after the news conference announcing a connection between the three cases, and he abruptly left Robra's residence with all of his belongings when she advised him the police wanted to speak to him.  Flight to avoid apprehension or arrest is a circumstance that the jury may consider in establishing guilt.  Turman v. Commonwealth, 276 Va. 558, 564, 667 S.E.2d 767, 770 (2008).

Finally, appellant's own writings establish his motive to commit the crimes.  His unabated anger and desire for retaliation against the people he considered responsible for the loss of his custodial rights are a recurring theme.  Repeated and irrational threats of violence abound in his journals.

We hold that the trial court did not err in finding that the evidence was sufficient for the jury to find appellant guilty of the crimes for which he was charged.

## C.  Assignment of Error 3:  Sentencing

Appellant contends that the court violated his Fifth Amendment right against double jeopardy by sentencing him for the capital murders of both Lodato and Kirby.  He asserts that the two life sentences he received punished him for the same conduct.

The Commonwealth charged appellant with two counts of capital murder pursuant to Code § 18.2-31(8):[4] one count for the murder of Lodato in 2014, and another count for the murder of Kirby in 2013. Each count used the other murder as the predicate act to elevate the charge to capital murder. Appellant argues that although the Commonwealth could seek a conviction on each of the charges, the court was precluded from sentencing him for both offenses.

"We review *de novo* claims that multiple punishments have been imposed for the same offense in violation of the double jeopardy clause." Lawlor v. Commonwealth, 285 Va. 187, 227, 738 S.E.2d 847, 870 (2013).

"The Fifth Amendment guarantee against double jeopardy . . . consists of three separate constitutional protections." Andrews v. Commonwealth, 280 Va. 231, 279, 699 S.E.2d 237, 264 (2010). "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. *And it protects against multiple punishments for the same offense*." Id. (emphasis added) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969)).

Appellant relies on the test set out in Blockburger v. United States, 284 U.S. 299, 304 (1932).[5] However, the Blockburger test only applies when "*the same act or transaction constitutes a violation of two distinct statutory provisions*." 284 U.S. at 304 (emphasis added). When we consider the two capital murders in the case before us, we determine that it is unnecessary to apply the Blockburger test. As the Supreme Court of Virginia held:

> [i]n the prosecution for two crimes in the same trial, the double
> jeopardy defense does not apply unless (a) the defendant is twice

---

[4] "The willful, deliberate, and premeditated killing of more than one person within a three-year period."

[5] "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each [offense] requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304.

punished for *one criminal act, and* (b) the two punishments are either *for the same crime* or one punishment is for a crime which is a lesser included offense of the other.

Coleman v. Commonwealth, 261 Va. 196, 200, 539 S.E.2d 732, 734 (2001) (emphasis added); see also Fitzgerald v. Commonwealth, 223 Va. 615, 635, 292 S.E.2d 798, 810 (1982) ("[w]e have used the Blockburger test on numerous occasions to resolve double jeopardy issues where the defendant was convicted at a single trial of multiple offenses *arising out of the same transaction* and the authorized legislative punishments were less than plain" (emphasis added)).  This case does not involve multiple offenses arising out of the same act or transaction; rather, the Kirby and Lodato cases are two separate murders that were committed months apart at separate locations.

Appellant relies on Andrews to support his contention that the court erred in sentencing him for both the Kirby and Lodato murders.  His reliance is misplaced.  In Andrews, the defendant killed two men during a robbery.  280 Va. at 245, 699 S.E.2d at 245.  He was charged with one count of capital murder under Code § 18.2-31(7) (killing more than one person as part of the same act or transaction), and two counts of capital murder under Code § 18.2-31(4) (killing the two men during the commission of a robbery).  Id. at 245, 699 S.E.2d at 244-45.  He also was charged with one count of capital murder for killing the two men within a three-year time period under Code § 18.2-31(8).  Id. at 245, 699 S.E.2d at 245.  The charges under subsections (7) and (8) were both based on the murders of two people that occurred in the same act or transaction, during the robbery. Id.

The sentencing issue in Andrews was

> whether the General Assembly intended through its enactment of Code § 18.2-31(8) to permit the punishment of the commission of two or more murders that occur within a three-year period as a separate offense when all of the constituent crimes for that offense *also occur as part of the same act or transaction* and the defendant is also convicted and punished for capital murder under Code § 18.2-31(7) in the same trial.

- 18 -

Id. at 282, 699 S.E.2d at 266 (emphasis added). The defendant contended that he could not "be convicted and punished under both Code §§ 18.2-31(7) and -31(8) because both offenses were proven based upon the *concurrent* murders of [the two victims]." Id. at 279, 699 S.E.2d at 264 (emphasis added). On appeal, the Court agreed with the defendant's double jeopardy argument and found "that the General Assembly could not have intended to create a separate offense of capital murder under [subsection 8, for] which a defendant could be punished for the same conduct for which he also could be punished under Code § 18.2-31(7)." Id. at 287, 699 S.E.2d at 269.

However, in Andrews, the Court specifically noted that

> [n]othing in this opinion should be construed as barring the Commonwealth from seeking to convict and punish a defendant for capital murder under both Code §§ 18.2-31(7) and -31(8) where . . . the evidence proves that one or more of the constituent killings that form the basis of the latter offense occurred as part of a separate act or transaction from the constituent killings that support the indictment under the former.

Id. at 288 n.19, 699 S.E.2d at 269 n.19. Because the exact same conduct violated two statutory provisions, the Court found that while the Commonwealth could indict for murder under both subsection (7) and (8), it could not seek separate punishments for each offense. Id. at 287-88, 699 S.E.2d at 269-70. Therefore, the issue in Andrews was whether two murders, committed concurrently, as part of the same act or transaction, could result in convictions and capital murder sentences pursuant to both Code § 18.2-31(7) and (8). Id.

Appellant's case differs significantly from Andrews. Here, two separate murders occurred months apart. They were separate crimes and events; they were not part of the same "act or transaction." The fact that each murder provided the predicate offense for a conviction under Code § 18.2-31(8) does not limit appellant's liability for conviction and sentencing on both charges.

Code § 18.2-31(8) contains no temporal restriction mandating that the first of the two murders is a predicate murder and only the second is a capital murder. Clearly, the intent of the

statute is to enhance the punishment for a defendant who commits multiple murders. See Holley v. Commonwealth, 64 Va. App. 156, 165, 765 S.E.2d 873, 877 (2014) (*en banc*) ("the purpose behind Code § 18.2-31 was to ensure that the worst murderers remained eligible for the ultimate sanction"). Therefore, the court did not err in sentencing appellant for two counts of capital murder in the Kirby and Lodato homicides.

CONCLUSION

The court did not err in joining the charges in the three murder cases, and the evidence was sufficient to support the convictions. Further, the court did not err in convicting and sentencing appellant for two counts of capital murder. Accordingly, we affirm appellant's convictions.

Affirmed.