COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Huff and Lorish
Argued at Norfolk, Virginia

SCOTT EDWARD PEASE

MEMORANDUM OPINION[*] BY
v.     Record No. 0846-22-1     JUDGE ROBERT J. HUMPHREYS
JUNE 13, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John R. Doyle, III, Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Jason D. Reed, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

After a jury trial in the Norfolk Circuit Court, Scott Edward Pease appeals his convictions of

strangulation, assault and battery, and entering and remaining in the home of a person with a

protective order. Pease argues the circuit court erred by (1) not taking appropriate remedial action

in response to the Commonwealth's failure to comply with the discovery order, (2) denying his

motion to strike the strangulation charge for lack of sufficient evidence, and (3) entering a final

judgment order of guilty on the charge of entering and remaining in the home of a person with a

protective order because the evidence established the dwelling was not the protected party's home.

BACKGROUND

I. Facts Surrounding Discovery Order Violation

On January 19, 2022, Pease's jury trial commenced. At voir dire of the jury pool, the

Commonwealth announced the names of its expected witnesses to determine if the potential

[*] This opinion is not designated for publication. See Code § 17.1-413.

jurors were acquainted with them. After the jury was selected and sworn, the Commonwealth made its opening statement during which it again named its expected witnesses. As the Commonwealth called its first witness to testify, counsel for Pease objected. He argued that a discovery order had been in place since September 2021 and that he just learned in the Commonwealth's opening statement "for the first time who the Commonwealth intends to call as witnesses." Defense counsel objected to testimony by "any witness who has not been disclosed, per the discovery order, prior to trial."

The circuit court read paragraph 8 of the discovery order: "The Commonwealth shall disclose to the defendant before trial, a written list of witnesses including names and addresses . . . expected to testify for the Commonwealth at trial or sentencing, . . . ." The court noted from its file that on December 22, 2021, the Commonwealth provided thirty-three items of discovery to defense counsel, but no list of witnesses.

The Commonwealth conceded that it had inadvertently violated the discovery order. However, the Commonwealth pointed to the "massive amount of discovery" that it gave to defense counsel pursuant to the court's discovery order and argued that there was no bad faith in its failure to also produce the list of witnesses expected to testify for the Commonwealth. The prosecutor noted that he and defense counsel had been in contact with each other since the prosecutor received the case, and it would have been appropriate for defense counsel to just ask for the witness list or file a motion to compel in advance of trial. The Commonwealth suggested the appropriate remedy was to adjourn the matter or grant a mistrial.

Pease asserted that he was prejudiced because he was denied his right to prepare his defense, and due to the massive amount of information provided, he needed to know the list of expected witnesses to make effective use of that information. He also stated that the Commonwealth would have been in compliance with the order if it handed the list to counsel

immediately prior to the start of trial, even "30 seconds before trial."[1]  Defense counsel argued that declaring a mistrial or adjourning the matter would prejudice Pease, who would have to remain in jail for several months awaiting trial, adding that he is an elderly stage 4 cancer patient.  He maintained that the remedy should be to prevent the Commonwealth from calling witnesses to testify who were not disclosed in accordance with the discovery order.

The circuit court agreed that the Commonwealth had not complied with the discovery order by failing to provide defense counsel with a witness list.  Then the court contemplated what remedy to fashion.  The court considered each witness whom the Commonwealth named in its opening statement and noted that the court file contained subpoena returns for each of them except for the forensic nurse examiner.  The circuit court noted that the forensic nurse examiner was not subpoenaed, "however, the defendant was provided with two reports prepared by [the nurse] and was certainly on notice that [the nurse] was . . . essentially a witness in the case, because [she] had been involved in that regard."

The circuit court found no bad faith by the Commonwealth, "no surprise to the defendant," and "very little prejudice to the defendant" from the Commonwealth's failure to provide him with a list entitled "Witnesses."  The court found that the identity of all of the witnesses was "readily apparent from the Court file, and in many instances, supplemented by reports or statements given by different witnesses."  Thus, the circuit court denied the defense's motion to prohibit any witnesses from testifying for the Commonwealth.

## II.  Facts Established at Trial

Pease and Monica Harrison married on July 31, 2010.  They lived together until April 1, 2021, when the parties separated, and Pease went to live with his sister.  At the time of their

---

[1] Defense counsel based his position on the fact that the discovery order itself set no time limit for producing the witness list.  Pease maintains this position on appeal.

separation, they were renting a house located on Sheryl Drive in Norfolk, Virginia, where they had lived for three years. Harrison stopped living there on April 2. On April 5, the landlord gave Pease and Harrison notice that they would have to leave the residence and completely move out by the end of May 2021. Initially, Harrison gave Pease "free rein" of the residence for two or three weeks so he could remove his personal property from the house. Then the landlord informed Harrison that Pease was done moving his belongings so Harrison could proceed to moving her property out of the house.

On April 22, 2021, the Norfolk Juvenile and Domestic Relations District Court entered a protective order against Pease, ordering no contact with Harrison, which remained in effect until April 22, 2023. On Saturday, May 1, the landlord met Harrison at the house. Harrison believed Pease had been to the house that day and the landlord had observed destruction inside and "gas all over the house," so the landlord had the locks changed the next day. On May 2, the landlord gave Harrison keys to the new locks, and Pease did not have keys to the new locks. Also on May 2, Harrison met a contractor at the house to repair the back door, which had been kicked in many times.[2] Harrison stayed at the house until after the contractor left; when Harrison left, the doors to the house were all fixed and the house was secured.

On May 3, Harrison arrived at the house after 1:00 p.m. to move her clothes and furniture out of the house. She entered the residence and took a mattress outside to the truck. She reentered the house and was looking for other items when she thought she heard something upstairs. She was heading for the front door when Pease jumped out of the closet near the front door. Pease was wearing a mask and a hoodie. He covered her face with a "very used washcloth" that had a liquid substance on it. Next, she remembered lying on her stomach with

---

[2] Harrison testified that her son kicked the door in one time, but the record is silent as to who kicked the door in on the "many" other occasions.

- 4 -

Pease on her back, still holding the cloth on her face. She managed to turn around to lie on her back. Pease, wearing a rough, leathery welder's glove, tried to stick his hand down her throat passage. He then took out her false teeth and "got his whole hand in there," and she could not breathe through her throat. He stuffed the cloth in her mouth, and she could feel it going up her nose. Then Harrison stabbed Pease in his side and thigh with a small paring knife she had in her back pocket. Pease then tased Harrison at several spots on her head with a Taser Harrison had left at the house the night before.

Next, Pease put Harrison in the closet and closed the door. She noticed her lips, which had been fine before the attack, were now chapped, cracked, bleeding, and very swollen. Pease brought her a pitcher of water and told her to clean her face. After she cleaned her face with the water, Pease pushed her back in the closet and put his hands around her neck and squeezed her throat. She could not breathe when he had his hands around her throat. Harrison managed to fight him off and then he squatted down on his knees and screamed at her, "This is your fault. You did this to me." Melissa Harrison, who had just arrived to help her sister move out, heard Pease screaming from inside the house and immediately called 911.

After screaming at her, Pease pulled Harrison out of the closet by her hair and dragged her to the bottom of the stairs. Pease demanded that she move upstairs into a bedroom. While they were upstairs, they heard a knock at the door. Pease went to the window and saw Harrison's sister outside. Pease gathered his things and told Harrison, "Give me time to get out of here."

Harrison exited the house by the front door; she was visibly shaken, gasping for air, and coughing up blood. Her sister and police officers were in the front yard. An ambulance transported Harrison to a nearby hospital trauma unit for care. The nurse who examined Harrison testified to Harrison's injuries under her jaw and on her neck, where she observed

bruising and swelling. The nurse reported that Harrison complained of pain when swallowing.[3] Officer Jennifer Baron met Harrison at the hospital. She also observed and photographed abrasions and bruising on Harrison's neck. Officer Baron testified that Harrison had very labored breathing and difficulty speaking during their visit.

Investigators at the scene of the crime found a damaged door frame with "pry marks" at the back door of the house. They also found the house ransacked and furniture vandalized with the words "whore" and "slut" painted on and scratched into the furniture. Gloria Hill, of the Virginia Department of Forensic Science, analyzed DNA samples taken from the parties and the evidence. She testified that Pease's DNA was found on swab samples taken from Harrison's neck and from the stun gun recovered from the scene.

After the Commonwealth rested its case, defense counsel made several motions to strike the charges against Pease. Defense counsel argued the court should strike the strangulation charge because he said there was no evidence that Pease impeded the blood circulation or respiration of Harrison. The court denied the motion.[4] Then the defense presented evidence in the form of police body camera footage and brief testimony of one officer who testified that she did not find Pease in the house after Harrison came out of the house. Defense counsel renewed his motion to strike the strangulation charge, which the court again denied. The jury found Pease guilty of assault and battery on the charge of malicious injury by caustic substance, guilty of entering and remaining in the home of a person protected by a protective order, and guilty of strangulation.

---

[3] Harrison testified that swallowing was painful, and it was two-and-a-half weeks before she could have anything but liquids.

[4] The circuit court struck the common law burglary charge finding insufficient evidence that Pease had no legal right to be in the house.

ANALYSIS

I. Discovery Order Violation

Pease asserts that the circuit court erred by taking no remedial action in response to the Commonwealth's failure to comply with the terms of the discovery order, issued in accordance with Rule 3A:11(b)(5) and requiring the Commonwealth to disclose a written list of its expected witnesses prior to trial.

"The relief to be granted upon a violation of Rule 3A:11 is within the discretion of the trial court, giving due regard to the right of the accused to call for evidence in his favor and to investigate and evaluate the evidence in preparation for trial." *Frye v. Commonwealth*, 231 Va. 370, 383 (1986). Thus, "[o]n appeal, this Court reviews a claim that the trial court erred in the manner in which it oversaw the parties' discovery pursuant to the Rules of the Supreme Court of Virginia under an abuse of discretion standard." *Harvey v. Commonwealth*, 76 Va. App. 436, 472 (2023). "When we say that a circuit court has discretion, we mean that 'the [circuit] court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Galiotos v. Galiotos*, 300 Va. 1, 10 (2021) (alteration in original) (quoting *Landrum v. Chippenham and Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).

As stated supra, the discovery order requires the Commonwealth to "disclose to the defendant before trial, a written list of witnesses including names and addresses . . . expected to testify for the Commonwealth at trial or sentencing . . . ." *See* Rule 3A:11(b)(5). The discovery order also contains a "Continuing Duty to Disclose" section, which provides that upon a party's failure to comply with Rule 3A:11 or order issued pursuant thereto, "the court shall order such party to permit the discovery or inspection of materials not previously disclosed and *may* grant such other relief authorized by Virginia law as it *may* in its discretion deem appropriate."

(Emphasis added.)  *See* Rule 3A:11(h).  Code § 19.2-265.4(B) provides options for relief in the event the Commonwealth fails to comply with discovery as provided under Rule 3A:11.  It states, "the court may order the Commonwealth to permit the discovery or inspection, grant a continuance, or prohibit the Commonwealth from introducing evidence not disclosed, or the court *may enter such other order as it deems just under the circumstances*."  Code § 19.2-265.4(B) (emphasis added).  Thus, the discovery order, Rule 3A:11(h), and Code § 19.2-265.4(B) all point to the circuit court's broad discretion in determining an appropriate remedy for a discovery order violation.  Furthermore, case law adequately addresses the purpose behind the discovery rules and the factors the circuit court may consider in fashioning a remedy upon a party's noncompliance with the rules.

A principal purpose of discovery is to eliminate surprise at trial.  *Little v. Cooke*, 274 Va. 697, 718 (2007) (finding the circuit court abused its discretion by awarding damages to Little based on admitted evidence that had not been disclosed in discovery).  However, "[w]hen a discovery violation does not prejudice the substantial rights of a defendant, a trial court does not err in admitting undisclosed evidence."  *Davis v. Commonwealth*, 230 Va. 201, 204 (1985) (finding no prejudice because Davis's counsel was "unable to suggest to the trial court" how earlier disclosure of two autopsy photographs "would have benefited [her] defense or altered the course of the trial").

In *Harvey*, this Court found that because the defendant did not establish prejudice, the circuit court did not abuse its discretion by admitting a late disclosed recording of a phone call.  76 Va. App. at 473.  The Court stated that "when a defendant challenges the prosecution's late disclosure of inculpatory evidence under Rule 3A:11 and asks for sanctions, he must prove that the late disclosure prejudiced his case."  *Id.*  The defendant only alleged prejudice asserting "ways in which his trial strategy *might* have differed if he had more time to evaluate the content

of the recorded phone call." *Id.* The Court also considered that defense counsel could have requested a continuance the day prior to trial but did not. *Id.*

In *Lane v. Commonwealth*, 20 Va. App. 592, 593 (1995), the appellant argued that the trial court erred in admitting his own statement to police which was not disclosed in discovery pursuant to Rule 3A:11. The statement, he argued, impeached his credibility, and jeopardized his defense. *Id.* at 594. This Court considered that the discovery violation was not intentional and that "Lane declined the trial court's offer of a continuance and declined to move for a mistrial." *Id.* at 595. This Court found no abuse of discretion in the trial court's allowing the statement into evidence, noting that "Lane declined to move for a remedy that would have permitted him to accommodate his defense to the discovered statement. He sought only suppression of the truth." *Id.*

In this case, it is uncontested that the Commonwealth violated the discovery order. While any violation of a court order is a serious matter, it is wholly discretionary with the court to determine the remedy for such a violation considering various factors including the degree to which the order was violated and the demonstrated prejudice to the other party. As for prejudice to his defense, Pease asserted before the circuit court that he was prejudiced because he could not prepare a defense or impeachment material for the witnesses, and he was unable "to evaluate any plea offers that might be made in this case or even make a plea offer which might be acceptable to the Commonwealth." Pease also insisted at trial that the only remedy was to disallow any testimony from any witness as none were disclosed in accordance with the discovery order. On appeal, Pease now concedes that exclusion of the witnesses' testimony is not mandated by Rule 3A:11(h). Nevertheless, he takes umbrage with the circuit court's failure to address his asserted prejudice, failure to provide the remedy of a brief delay to evaluate the information, and failure to require the Commonwealth to produce a witness list.

The circuit court considered its obligation to fashion an appropriate remedy and explored what prejudice Pease actually suffered by not having the list of the Commonwealth's witnesses. The circuit court found that none of the witnesses were surprise witnesses. The circuit court noted that the Commonwealth subpoenaed the witnesses it intended to call and those subpoena returns were "in the public court file for the defendant to see," with the exception of the forensic nurse examiner. As for the nurse, the court found that she prepared two reports, the sexual assault nurse examination and the strangulation examination, which were provided to Pease and he was thus on notice that she was a witness in the case. The circuit court found "very little prejudice" to the defendant under the circumstances, because there was "no surprise to the defendant here."

Moreover, Pease stated in his motion to prevent the witnesses from testifying that the prosecutor would have complied with the discovery order by giving him the witness list 30 seconds before the trial on the merits began. This assertion supports the circuit court's determination that he was not significantly prejudiced by not receiving the witness list, because the witnesses were named by the Commonwealth during voir dire of the jury pool, which occurred more than 30 seconds before the trial began. It is untenable to suggest that receiving a *written list* of expected witnesses 30 seconds before the trial began would have affected defense counsel's trial strategy and preparation differently than hearing the names of the expected witnesses called aloud minutes prior to selection of the jury.

The purposes of discovery relevant to this case are disclosure of "all relevant and material evidence before trial in order that the trial may be an effective method for arriving at the truth and not a battle of wits between counsel," and to eliminate surprise at trial. *Little*, 274 Va. at 717 (quoting *Guilford Nat'l Bank of Greensboro v. Southern R. Co.*, 297 F.2d 921, 924 (4th Cir. 1962)). The circuit court's factual finding that there was no surprise to Pease is supported by the

record.  The circuit court did not abuse its discretion by denying Pease's motion to prohibit of all the Commonwealth's witnesses from testifying, the only remedy Pease requested at trial.

Pease did not ask the circuit court for a delay or a continuance, nor did he ask the circuit court to require the Commonwealth to hand over a written list of witnesses to comply with the discovery order.  Because Pease did not make these arguments in the circuit court, he cannot now complain that the circuit court failed to act accordingly.  *See* Rule 5A:18.  In short, based upon the record before us, we cannot say that the circuit court abused its discretion in the way it addressed the violation of its order requiring discovery in this case.

## II.  Strangulation

Pease asserts the evidence was insufficient to support a conviction of strangulation, namely that the "evidence is insufficient to infer that [Harrison's] blood circulation or respiration were affected by his grasping her by the neck."

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we must view the evidence in the light most favorable to the Commonwealth, the prevailing party at trial." *Wandemberg v. Commonwealth*, 70 Va. App. 124, 132-33 (2019) (quoting *Severance v. Commonwealth*, 67 Va. App. 629, 647 (2017)).  "This well-settled principle of appellate review 'requires us to discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* at 133 (quoting *Camp v. Commonwealth*, 68 Va. App. 694, 698 (2018)).  "Accordingly, the trial court's judgment will not be disturbed unless it appears from the evidence that such judgment 'is plainly wrong or without evidence to support it.'" *Id.* (quoting *Christian v. Commonwealth*, 59 Va. App. 603, 608 (2012)).

Strangulation of another is proscribed in Code § 18.2-51.6:

> Any person who, without consent, impedes the blood circulation or respiration of another person by knowingly, intentionally, and

- 11 -

unlawfully applying pressure to the neck of such person resulting in the wounding or bodily injury of such person is guilty of strangulation, a Class 6 felony.

At trial, the Commonwealth referred to the strangulation charge and asked Harrison what Pease did to her. Harrison stated, "He put his hands around my throat," and he "[s]queezed my throat." Asked, "Did that affect your breathing in any way?" she responded, "Yes." Then the prosecutor asked, "How did it affect your breathing?" and she elaborated, "I couldn't breathe when he had his hands around my throat." When asked if she had any injuries to her neck she replied, "Yes. I couldn't breathe. I couldn't swallow. It was two-and-a-half weeks before I could have anything but liquids . . . ." Photographs taken at the hospital after the incident show bruises, scratches, and red marks to Harrison's neck.

Harrison testified three times at trial that she could not breathe when Pease squeezed her neck. Her testimony is corroborated by evidence of injuries around her neck and her difficulty swallowing after the incident. With this evidence a rational fact finder could have found that Pease impeded Harrison's respiration when he squeezed her neck. The jury's judgment finding Pease guilty of violating Code § 18.2-51.6 is not "plainly wrong or without evidence to support it." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting Code § 8.01-680).

### III. Entering and Remaining in the Home of a Protected Person

Pease argues that the evidence "affirmatively established that the element of entry into the home of a protected person under a protective order did not occur." He admits that he failed to preserve this issue for appeal and seeks to invoke the ends of justice exception to Rule 5A:18.

Pease was convicted of violating Code § 16.1-253.2(C), which provides, in part:

Any person who violates such a protective order by furtively entering the home of any protected party while the party is present, or by entering and remaining in the home of the protected party until the party arrives, is guilty of a Class 6 felony, . . . .

- 12 -

Rule 5A:18 provides, "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."

> In order to show that a miscarriage of justice *has* occurred, thereby invoking the ends of justice exception, the appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur.

*Redman v. Commonwealth*, 25 Va. App. 215, 221-22 (1997). "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt v. Commonwealth*, 66 Va. App. 199, 210 (2016) (en banc) (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009)).

Pease asserts that Harrison "abandoned the dwelling as her abode in early April 2021," and this was "affirmative proof that Harrison was not residing at the residence." We disagree with Pease's assertion. Various circumstances may enter the determination of whether a particular dwelling place is the home of a protected party. Here, the evidence established that Harrison had lived at the Sheryl Drive address for three years and continued to lease the property on the date of the offense. The landlord gave Harrison the keys to the new locks installed in the home on May 2, the day before the offense occurred. Although Harrison testified that she stopped living at the house on April 2, she had numerous personal property items still at the house on the date of the offense, including clothing and furniture. Furthermore, there is no requirement in the statute that the home involved in the offense be the *only* home of the protected party, or the permanent home of the protected party. These circumstances do not amount to affirmative proof that the offense did not occur at the home of the protected party. We find no miscarriage of justice here.

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Affirmed.*