COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Malveaux, Causey and Chaney
Argued by videoconference


RICARDO TINOCO-RIVERA

                                                        MEMORANDUM OPINION* BY
v.        Record No. 0848-21-4              JUDGE MARY BENNETT MALVEAUX
                                                        MARCH 22, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Jeanette A. Irby, Judge

William J. Bang (Alex Levay, PLLC, on brief), for appellant.

Rebecca M. Garcia, Assistant Attorney General (Mark R. Herring,[1]
Attorney General, on brief), for appellee.


Ricardo Tinoco-Rivera ("appellant") was convicted of four sexual offenses committed

against his stepdaughter, A.M.[2]:  taking indecent liberties with a stepchild who was at least

fifteen but less than seventeen years old, in violation of Code § 18.2-370(D)(i); fornication with

a stepchild who was at least fifteen but less than seventeen years old, in violation of Code

§ 18.2-366; rape of a child under thirteen years old, in violation of Code § 18.2-61(A)(iii) and

(B)(2); and aggravated sexual battery of a person less than thirteen years old, in violation of

Code § 18.2-67.3(A)(1).  On appeal, appellant argues that the trial court erred in preventing him

from cross-examining A.M.'s mother about her potential bias and motivation for testifying

against him.  For the following reasons, we affirm the trial court.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

[2] We use initials, rather than the victim's name, to protect her privacy.

# I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).

A.M. was born in September 2003. In April 2012, her mother, Luz Monroy-Cruz, married appellant, who was not A.M.'s biological father. Monroy-Cruz testified at trial that at the time of her marriage, she and appellant, together with A.M. and A.M.'s three siblings, lived in the basement of Monroy-Cruz's parents' home. They lived there until October 2015, when they moved to an apartment. Monroy-Cruz further testified that at both residences, appellant was often left alone with A.M. and the other children.

In May 2019, child protective services contacted Monroy-Cruz and told her that A.M.'s sister had alleged that she had been sexually abused by appellant. The sister further alleged that appellant had abused A.M. When Monroy-Cruz asked A.M. about the allegations, A.M. "broke down" and told her that she had been sexually abused and it "ha[d] been happening for a very long time."

Shortly thereafter, Monroy-Cruz discovered that $1,400 was missing from her and appellant's joint checking account and had been transferred to someone in Mexico, appellant's nation of origin. She reported the missing money to the police, as well as the fact that one of the couple's vehicles was missing. The police traced appellant's phone to the Chattanooga area and, a few hours later, appellant was arrested in Louisiana.

A.M. testified at trial that after Monroy-Cruz asked her about appellant's conduct, she told Monroy-Cruz that appellant had been touching her breasts and vaginal area and penetrating her vagina with his penis. A.M. related that appellant first had intercourse with her around the

time that he married her mother—*i.e.*, in 2012, when A.M. was living with her family in the basement of her grandparents' home. Appellant had remained clothed during the sex act but had removed A.M.'s clothing.

A.M. stated that after the initial act of intercourse, appellant continued to have sex with her "about once a week or every other week" until April 2019. The encounters followed a pattern, with appellant first touching A.M.'s breasts and vaginal area before penetrating her vagina with his penis. Appellant would also ask A.M. to touch his penis and would sometimes play pornographic videos on his phone or the television. A.M. also recalled that at one point in time, appellant had asked her to give him her underwear. A.M. complied with appellant's request and did not recall ever getting her underwear back.

A.M. testified that after the family moved to an apartment in 2015, appellant continued to have sex with her as frequently and in the same manner. Although appellant never used violence to induce these interactions, he used verbal means to coerce or manipulate her into compliance when she would "try to walk away from the situation" or did not want to "give in to what he wanted [her] to do."

A.M. also testified about text messages between herself and appellant that were entered into evidence. In one set of messages, dated July 24, 2017, appellant repeatedly asked A.M. to send him photographs of her naked body. In another set of messages, dated August 18, 2017, A.M. stated to appellant that she was about to take a shower and appellant replied, "I want to see."

The trial court also heard the testimony of Aron Monroy, A.M.'s grandfather, who confirmed that appellant, Monroy-Cruz, A.M., and A.M.'s siblings had lived in the basement of his home at one time. Monroy testified that in July 2019, several years after A.M. and her family had moved out of his home, he was at work in the basement when he discovered certain items.

While repairing a small door in the basement wall that provided access to the home's master water valve, Monroy noticed that some insulation had fallen into a narrow gap behind the wall. Monroy could also see other things in the "hole" behind the access door. Using a wire clothes hanger, he retrieved "an article of male clothing, two girl[']s intimate articles of clothing, a box of sleeping pills, and some used condoms." Monroy placed the items in a bag and notified Monroy-Cruz, who picked up the bag and took it to the police. The police later submitted the items to the Virginia Department of Forensic Science, together with buccal swabs taken from appellant and A.M.

Kari Dodd, a forensic scientist with the Virginia Department of Forensic Science, testified as an expert in forensic biology. She stated that she had received and analyzed the items and swabs provided by the police, including a pair of girl's pink underwear which contained traces of sperm on the right and left hips and in the interior of the crotch. Dodd developed a DNA profile from the sperm found on the underwear's crotch and testified that appellant could not be eliminated as a contributor to that profile. She subsequently certified that the probability of randomly selecting an unrelated individual with a DNA profile matching that developed from the sperm sample was "1 in greater than 7.2 billion." Dodd also developed a DNA profile from additional, non-sperm DNA that she found on the underwear. A.M. could not be eliminated as a contributor to that profile.

Additionally, Dodd examined a pair of girl's floral underwear which contained traces of sperm in the interior crotch and interior front panel. After developing a DNA profile from the sperm, Dodd certified that appellant could not be eliminated as a contributor to the profile and that the probability of randomly selecting an unrelated individual matching the DNA profile was again "1 in greater than 7.2 billion." Additional, non-sperm DNA was also present on the

interior crotch. Dodd developed a profile from that DNA from which A.M. could not be eliminated as a contributor.

Dodd also developed a DNA profile from sperm detected inside one of the used condoms, and appellant could not be eliminated as a contributor of that profile. The pair of men's underwear was also examined by Dodd, although she could not develop a usable DNA profile from the garment.

At trial, the Commonwealth introduced a photograph of the girl's pink underwear Monroy had found inside his basement wall and which police had submitted for forensic analysis. A.M. identified the underwear as hers. However, she could not recall whether the floral pair of girl's underwear was her own, stating only that "It's possible." Monroy-Cruz identified both pair of underwear at trial, stating that they had belonged to A.M. and that she had purchased them for her. Monroy-Cruz also identified the men's underwear found in the basement, stating that she had purchased them for appellant.

During cross-examination of Monroy-Cruz, counsel for appellant asked her, "You entered the United States illegally, is that correct?" The Commonwealth's attorney objected to the question on grounds of relevance, and the trial court sustained the objection. Later, counsel for appellant asked Monroy-Cruz, "Have you ever talked to a lawyer about your immigration situation?" The Commonwealth's attorney stated that she would "object to that again," and the following exchange ensued:

> [COUNSEL FOR APPELLANT]: Well, it could be a motivation. There was a basis for status for someone who is here illegally who cooperates in a criminal investigation. I think it's a perfectly legitimate area of inquiry. It could provide a motivation.
>
> [COMMONWEALTH'S ATTORNEY]: Judge, I would just suggest to the Court, I know [counsel for appellant] talked about this in his opening statement and I again don't know how he would have any inside knowledge of particularly my conversations with [Monroy-Cruz], but I can tell the Court I'm happy to tell the Court

right now, [she] would never, ever ask me one time about a UV status.[3]

THE COURT: And even if she had a conversation with a lawyer, it's subject to privilege, so she couldn't convey to you what was in that conversation.

[COUNSEL FOR APPELLANT]: Well, Your Honor, she could testify that somebody told her some things about her immigration status that this case might help her. With all due respect, [the Commonwealth's attorney] is not the only lawyer that that question referred to.

THE COURT: Well, it's still hearsay, so I'm going to sustain the objection.

During re-direct examination, the Commonwealth's attorney asked Monroy-Cruz, "you have never asked me as a prosecutor to do anything for you on other things, to submit anything to the Department of Justice, or fill out paperwork for you, or anything like that, is that right?" Monroy-Cruz replied, "Yeah, that's right. No." The Commonwealth's attorney later clarified to the court that she "wanted to be clear that [Monroy-Cruz] at one point mentioned a U-visa to me, but her comment was I know this exists. I don't believe, essentially, that this is an appropriate thing for me to try to pursue. It seems like using the system or something along those lines." The Commonwealth's attorney further explained that during their conversation, Monroy-Cruz had indicated that she knew U-visas existed but was "not interested in one. So just for—to make sure everyone is on that same page about that."

---

[3] In his opening statement, counsel for appellant had stated that Monroy-Cruz "saw a path to legal status through these proceedings known as a U visa." "U visas are available to noncitizens who have 'suffered substantial physical or mental abuse as a result of having been a victim of criminal activity' and who have 'been helpful, [are] being helpful, or [are] likely to be helpful' to authorities investigating or prosecuting that crime." *Cabrera v. Garland*, 21 F.4th 878, 881 (4th Cir. 2022) (alterations in original) (quoting 8 U.S.C. § 1101(a)(15)(U)). Before filing an application for a U visa, the applicant "must obtain a certification from the relevant law enforcement authority attesting to this help." *Id*.

The trial court convicted appellant, noting that the evidence of his guilt was "overwhelming." After discussing the evidence supporting a conviction for each offense, the court specifically found that the testimony of Monroy and Monroy-Cruz was credible and that the witnesses had neither been impeached nor had their testimony been rebutted. It also stated that appellant's "going to Tennessee and then being picked up in . . . Louisiana and draining the parties' bank account where the funds had been sent to Mexico where he had family ties certainly gives this Court pause with respect to his behavior."

This appeal followed.

## II. ANALYSIS

Appellant argues that the trial court abused its discretion by refusing to allow him to cross-examine Monroy-Cruz on possible bias or motivation for testifying against him. He contends that he should have been permitted to question Monroy-Cruz about her "immigration situation," because if she had believed that she could change her immigration status through cooperation with the Commonwealth, such belief could have provided "a substantial motive for her testimony" and would have "raise[d] questions about her credibility."

"An accused has a right to cross-examine prosecution witnesses to show bias or motivation and that right, when not abused, is absolute." *Lambert v. Commonwealth*, 70 Va. App. 740, 753 (2019) (quoting *Brown v. Commonwealth*, 246 Va. 460, 464 (1993)). However, an accused does not have "an unlimited right to cross-examination. Indeed, the Supreme Court has held that 'trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination.'" *Id.* (quoting *James v. Commonwealth*, 254 Va. 95, 98 (1997)). Thus, "[w]hile the 'bias of a witness is always a relevant subject of inquiry when confined to ascertaining previous relationship, feeling and conduct of the witness,' a trial court nonetheless

- 7 -

'has discretion to limit the scope of cross-examination which is for the purpose of establishing bias.'" *Id*. at 755 (quoting *Jin v. Commonwealth*, 67 Va. App. 294, 309 (2017)).

We need not determine whether the trial court erred as alleged by appellant, because we conclude from the overwhelming evidence of appellant's guilt in the record that any such error was harmless.[4] *See Commonwealth v. White*, 293 Va. 411, 419 (2017) (noting that under the doctrine of judicial restraint, appellate courts should resolve matters on the best and narrowest available grounds and that one such ground may be a determination that any error was harmless).

"Code § 8.01-678 makes 'harmless-error review required in *all* cases.'" *Commonwealth v. Swann*, 290 Va. 194, 200 (2015) (quoting *Ferguson v. Commonwealth*, 240 Va. ix, ix (1990)). *See also* Code § 8.01-678 (providing, in pertinent part, that "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . for any error committed on the trial"). "Thus, it is 'the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless' lest they 'retreat from their responsibility, becoming instead impregnable citadels of technicality.'" *White*, 293 Va. at 420 (quoting *United States v. Hasting*, 461 U.S. 499, 509 (1983)). "As the United States Supreme Court has 'repeatedly stated, the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986)). Accordingly, we "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." *Carter v. Commonwealth*, 293 Va. 537, 544 (2017) (quoting *Shifflett v. Commonwealth*, 289 Va. 10, 12 (2015)).

---

[4] The Commonwealth contends that appellant failed to make a proper proffer at trial of the testimony he would have elicited through further cross-examination. In holding that any alleged error by the trial court in precluding that cross-examination was harmless, we necessarily assume, without deciding, that appellant did make an adequate proffer.

Because appellant alleges evidentiary error, "[w]e examine this claim under the standard for non-constitutional harmless error." *Salahuddin v. Commonwealth*, 67 Va. App. 190, 211-12 (2017). Under this standard, we may uphold a decision "if [we] can conclude 'that the error did not influence the [trier of fact] or had but slight effect.'" *Id*. at 212 (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)). "In the context of the required test, such error is harmless where 'other evidence of guilt is so overwhelming and the error so insignificant by comparison that the error could not have affected the verdict.'" *Smith v. Commonwealth*, 72 Va. App. 523, 543 (2020) (quoting *Salahuddin*, 67 Va. App. at 212).

Here, it is clear from the record that the evidence of appellant's guilt was, as the trial court characterized it, "overwhelming." A.M.'s uncontroverted and unimpeached testimony established that while she was in the requisite age range for each offense, appellant sexually abused her by touching her breasts and genitals, penetrating her vagina with his penis, and requesting that she touch his genitals. The Commonwealth introduced copies of text messages between appellant and A.M. in which appellant expressed his desire to see photographs of A.M.'s naked body. A.M.'s testimony also established that appellant committed his acts of abuse regularly and frequently over several years and according to a sustained behavioral pattern.

Further, A.M. identified a pair of girl's pink underwear, which her grandfather found behind a wall in the basement where A.M. and appellant had once lived, as her own. She also testified that at one time, appellant had asked her to give him her underwear. Upon forensic analysis, that underwear proved to contain a DNA profile from which A.M. could not be excluded as a contributor. The interior crotch of the garment also contained a DNA profile that was derived from sperm, and appellant could not be excluded as a contributor to that profile. Additionally, A.M.'s grandfather testified that he found used condoms and other garments in the same location as A.M.'s underwear. One of those garments was a pair of men's underwear, and

sperm residue from one of the condoms produced a DNA profile from which appellant could not be eliminated as a contributor.

Lastly, the Commonwealth adduced evidence that after the emergence of abuse allegations against appellant, a sum of money was transferred from appellant and Monroy-Cruz's bank account to someone in Mexico, where appellant was from. Further, one of the couple's vehicles went missing and appellant was arrested in Louisiana after his cell phone had first been traced to the Chattanooga area. A rational trier of fact could reasonably infer, as the trial court did, that this evidence was indicative of appellant's consciousness of guilt. *See Severance v. Commonwealth*, 67 Va. App. 629, 649 (2017) ("Flight to avoid apprehension or arrest is a circumstance that the jury may consider in establishing guilt.").

Because of the overwhelming nature of the above evidence of appellant's guilt, we may safely conclude that any alleged error by the trial court in limiting cross-examination of Monroy-Cruz for bias or motivation was "insignificant by comparison" and "could not have affected the verdict." *Smith*, 72 Va. App. at 543 (quoting *Salahuddin*, 67 Va. App. at 212). Accordingly, because any such error was thus "harmless to the ultimate result," we will not reverse the trial court. *Carter*, 293 Va. at 544 (quoting *Shifflett*, 289 Va. at 12).

## III.  CONCLUSION

For the foregoing reasons, we hold that if the trial court erred in refusing to allow certain cross-examination by appellant, any such error was harmless. Accordingly, we affirm appellant's convictions.

*Affirmed.*