# COURT OF APPEALS OF VIRGINIA

## Record No. 1844-24-4

BRENER MATEO SORTO

v.

COMMONWEALTH OF VIRGINIA

Present: Judges AtLee, Friedman and Senior Judge Annunziata
Argued at Alexandria, Virginia

Opinion Issued June 23, 2026[*]

### FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Matthew P. Snow, Judge

Meghan S. Skelton (Jonathan P. Sheldon; SkeltonLaw, LLC; Sheldon & Flood, PLC, on briefs), for appellant.

Kimberly A. Hackbarth, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General on brief), for appellee.

### MEMORANDUM OPINION BY
### JUDGE ROSEMARIE ANNUNZIATA

Following a jury trial, the Circuit Court of Loudoun County convicted Brener Sorto of

rape (two counts), forcible sodomy, aggravated sexual battery, and taking indecent liberties with

a minor by a custodian. On appeal, Sorto contends that the trial court erred by admitting

evidence of prior bad acts, by refusing to admit a medical record as not properly authenticated,

and by admitting a statement he made to police that implicated his right to remain silent. Upon

our review of the record, we find no error in the trial court and affirm Sorto's convictions.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND

In the Spring of 2019, Jennifer Segovia and her two daughters, L.L.S. and M.L.S., moved into the residence Sorto shared with his long-time fiancée, Jasmin Soriano-Morales.[2]  M.LS. was born in April 2008 and L.L.S. was born in November 2010, making the girls respectively 11 and 8 years old at the time.[3]

Segovia worked long hours and often left her daughters in Sorto's care.  The girls later testified that Sorto frequently called Segovia at work to misrepresent that they had not done their chores.  According to M.L.S., Segovia always believed Sorto and let him do whatever he wanted.  She testified that Sorto would force the girls to clean the house while hopping around on one leg.  He would also punish them by making them hold a wax candle warmer for at least an hour with their arms stretched out.  On one occasion, Sorto forced L.L.S. to drink a concoction made of dog food and water he had mixed in the blender, and then threatened M.L.S. she would have to do the same.  Sorto once hit L.L.S. ten times on her buttocks with a belt.  And Sorto often punished the girls by making them pick up dog feces from the backyard during the hottest parts of the day.

L.L.S. and M.L.S. had a dog named Billy Bob.  When Sorto felt that they were not taking proper care of Billy Bob, he threatened to take him to an animal shelter.  On one occasion, Sorto openly debated whether he should take Billy Bob to a kill shelter or a rehoming shelter and then left with the dog for 20 minutes to convince them that he had, in fact, surrendered the dog.  The girls and their mother were eventually able to persuade Sorto to allow them to keep Billy Bob.

---

[2] Soriano-Morales was the girls' paternal aunt.  L.L.S. and M.L.S. had known Sorto since birth and referred to him as their "Tio."

[3] The indictments referred to offenses Sorto committed only against L.L.S.

Both girls testified that Sorto often gave them "bear hugs," and he squeezed them until they urinated. Sorto smacked them on their buttocks and called it "play fighting" or "wrestling." He told the girls it was "just a game," but the girls found it physically painful and repeatedly asked him to stop. Sorto always told the girls that "respect is the most important thing."

L.L.S. and M.L.S. initially shared a bedroom at Sorto's residence and slept in separate beds. Sorto liked "cuddling" and would often host a "sleepover" with each girl, either in their shared bedroom or in a spare guest bedroom. The sleepovers soon became sexual in nature. M.L.S. recalled that the sexual abuse first started during one of Sorto's sleepovers when he came into the girls' bedroom and started "touching" her. Sorto stuck his hands between the "gaps" of her "Stitch onesie," touched her breasts, vagina and buttocks, and inserted his fingers into her vagina. Sorto touched M.L.S. "many times," but M.L.S. said nothing because she was scared, and she feared her family might break apart. He eventually stopped touching her when M.L.S. told him that she did not want any more "cuddle time or any of that."

L.L.S. recalled that Sorto's sexual abuse first started during one of Sorto's many sleepovers when she was nine years old and in the fourth grade. On that occasion, L.L.S. was "half asleep," when she realized her pants were halfway down and Sorto's penis was inside her vagina. At the time, L.L.S. was still in elementary school and arrived home from school 30 minutes to an hour earlier than M.L.S. Sorto often had sexual intercourse with L.L.S. in his bedroom before M.L.S. got home from school. He also sometimes kissed her, touched her breasts and buttocks, put his penis in her mouth, and licked her vagina. Sorto promised L.L.S. "surprise[s]" to get her upstairs to the bedroom, and he would also threaten to take things away from her if she did not comply.[4] At trial, L.L.S. explained she thought Sorto would hit her or

_____

[4] By "surprise[s]," L.L.S. thought Sorto intended to give her chocolate or a unicorn, because she "used to be obsessed with unicorns," but there were never any surprises. He merely used that as a ruse to get her to the bedroom so he could have sex with her.

"like do something" to her if she told anyone about the abuse because she knew he had "anger problems." She worried that Sorto "would like tell [her] mom something that didn't happen," and she was afraid of "getting in trouble."

In late 2021 or early 2022, M.L.S. moved out of the girls' shared bedroom and into the guestroom. In April 2022, M.L.S. discovered a hidden camera under the television in her bedroom. M.L.S. alerted her mother, and her mother called the police. The police investigated but could not determine who had planted the camera at that time, and the case went "inactive."

After the camera was found, the atmosphere in the home changed and the relationships in the household "deteriorated." There were constant arguments. In November 2022, Sorto and Soriano-Morales moved out of the residence. Segovia and the girls also moved out at the end of December, and within a week of moving, M.L.S. told Segovia about Sorto's sexual abuse. M.L.S. explained that she told her mother at that time because she knew they were moving out, "so there wouldn't be anything to worry about."

After M.L.S.'s disclosure, Segovia asked L.L.S. if Sorto had abused her too, and L.L.S. denied it. L.L.S. explained that she was "too scared, and plus [she] knew that [her] mom would have so much stress on her." A few months later, however, Segovia noticed that L.L.S. was "just sad" and in "a very dark place." She questioned L.L.S. again, this time asking her, "what did he do?" L.L.S. then disclosed to her mother that Sorto had raped her.

Loudoun County Sheriff's Detective Corinne Czekaj investigated the case. On May 25, 2023, Detective Czekaj posed as L.L.S. and texted Sorto that she "took a test and it says I'm pregnant." Detective Czekaj texted Sorto, "I have only told you. I can't tell my friends. I told them before I never had sex." The text further stated, "Tio I haven't done anything with anyone but you . . . does that mean you are the dad???" Sorto responded "??? Please face call me ??"

Following those text messages, Detective Czekaj arranged a controlled call between L.L.S. and Sorto. In the recorded call, Sorto asked L.L.S. if she had taken a pregnancy test. L.L.S. responded, "yes." Sorto asked her what the result was, and L.L.S. responded, "pregnant, positive." Sorto responded that he could not have babies. Sorto then asked L.L.S., "Did you have sex with any other guys, like seriously, legit?" After the controlled phone call, Detective Czekaj texted Sorto, "The internet said I can get abortion until 24 weeks. Do you think it's been 24 weeks already???" The detective texted Sorto "I kno you don't want to talk about it but I want to know if I can get one of those." Sorto replied, "Don't know and please have a good night."

On June 15, 2023, law enforcement officers executed a search warrant at Sorto's house and recovered his cell phones. The phones were forensically analyzed, and the controlled text messages between Sorto and Detective Czekaj were recovered. Sorto's web search history was also recovered and revealed that on May 30, 2023, Sorto searched for "quest labs ultrasound price," "chantilly walney rd doctors office," "patient.questdiagnostics.com/estimate," and "in virginia are you allowed to record a conversation."

Meanwhile, Detective Czekaj reopened the investigation into the hidden camera incident and obtained records from Sorto's Amazon account. During the execution of the search warrant at his house, Detective Czekaj explained that she was investigating the hidden camera incident, and Sorto made statements in response. At trial, the Commonwealth moved the trial court to admit Sorto's responses as adoptive admissions, and Sorto objected. Outside the jury's presence, the trial court listened to an audio recording of the conversation between Detective Czekaj and Sorto.

The conversation started with Detective Czekaj reading Sorto his *Miranda* rights twice. She then advised Sorto that this was about the camera that he had purchased on Amazon, and

Sorto responded, "Okay." Detective Czekaj asked Sorto if he knew what she was talking about, and Sorto responded, "Not exactly." Detective Czekaj reviewed the Amazon records with Sorto and referenced the account he made on February 23, 2022. She showed him the printout of the camera that he purchased on February 24, 2022, and had shipped to his address. Sorto responded, "Okay." The detective asked Sorto if that rang a bell, and Sorto told her to "keep talking." Sorto said he did not remember ordering a camera. He confirmed that he did search for a camera on Amazon, but he did not remember purchasing one. Sorto stated he conducted his search after they found the camera, but Detective Czekaj told him that his purchase was made before that, in February, and that his Visa credit card was used and that his name and phone number were on the account. Detective Czekaj told Sorto that he bought the camera, and Sorto responded, "Okay." The detective next asked Sorto if he saw "where [she] was going with this," and Sorto responded, "Yeah, I rather just shut up."

The trial court admitted the evidence. In rendering its ruling, the trial court explained that it had considered the inflection in Sorto's voice, the "cadence of the conversation," the way the references went and the information that was shared, Sorto's responses to each assertion, and the fact that when he was specifically confronted with the assertion that the camera he ordered matched the one found in M.L.S.'s room he immediately "transitioned from just mere acknowledgement to saying I need to shut up." Thus, having considered the "nuance" of the conversation, the trial court found that Sorto's responses were admissible under the adoptive admissions exception to the hearsay rule. In response, Sorto added an objection that his statement "I rather just shut up," was an impermissible reference to his right to remain silent. The trial court answered, "[r]ight, for guilt or innocence. This is an admissibility issue, in terms of admissibility of evidence and whether it qualifies as an adoptive admission." The trial court overruled Sorto's objection and admitted the statements as adoptive admissions.

Before trial, the Commonwealth moved *in limine* to admit Sorto's "prior bad acts," to include evidence of the sexual abuse of both girls, his punishments, manipulation, supervision and control of both girls, and evidence of the hidden camera. L.L.S. and M.L.S. both testified at the hearing. Both girls explained that Sorto falsely told their mother they had not done their chores, both girls described Sorto's punishments involving the wax candle, the dog food concoction, and the belt, both girls described his rough "play fighting" and "bear hugs," and both girls recounted the day Sorto pretended to take Billy Bob to the animal shelter. Both girls described in detail the acts of sexual abuse they endured. Detective Czekaj testified that her investigation of the hidden camera revealed that a "WiFi hidden spy camera" had been purchased on February 24, 2022, on a Visa card issued in Sorto's name and was shipped to Sorto's address and that the hidden camera found at Sorto's residence matched the Amazon product's standard identification number listed on the purchase history.

Loudoun County Child Advocacy Center Forensic Interviewer Jenna Hyde White testified as an expert witness in child abuse dynamics, including, but not limited to, sexual abuse grooming and late disclosure. White explained that grooming (also referred to as manipulation) is a "process commonly seen within child abuse but specifically, child sexual abuse where a[n] offender will groom or manipulate a child really to kind of prepare them." White testified that "[o]ne of the phases of it is more of kind of a maintenance, which . . . if abuse especially is to be repeated, may make it kind of repeat, and a pattern may emerge." She opined that when an offender begins abusing a child, he might implement tactics of grooming, manipulation, and control to maintain secrecy and "normalization of behaviors, and desensitization with the child." White explained that patterns of grooming may come in the form of "threats, force, coercion, [and] gift giving" and that family pets could also be used in a way to "coerce or manipulate the child into the secrecy and desensitization of the act."

White testified that one of the "biggest and most common barriers" to disclosure is the closeness of the relationship between the child and the offender. She explained that the "closer the relationship with the alleged offender, the harder it is for the child to disclose." Thus, delayed reports occur most commonly when the offender is "a parent, caregiver, close family member, or somebody in a parent-like role for the child." White further stated that it was not uncommon for an offender to sexually abuse multiple children living within the same household. She opined that grooming, manipulating, and perpetrating acts on multiple children in the same home at the same time could be a form of "normalizing that abusive behavior." Or, if the offender is losing access to one child due to that child getting older or leaving home, the offender may start to groom or manipulate a younger child within the home.

Over Sorto's objection, the trial court granted the Commonwealth's motion to admit the alleged uncharged sexual abuse of M.L.S., the punishments, manipulation, supervision and control over L.L.S. and M.L.S., and the evidence pertaining to the hidden camera. The trial court also held, however, that the prior bad acts evidence could only be admitted with an appropriate limiting jury instruction such that the evidence may only be received to show motive, method, common scheme or plan, the relationship between L.L.S. and Sorto, and Sorto's incestuous disposition and lascivious intent.

Sorto testified at trial. He admitted to threatening to take Billy Bob to the animal shelter and to spanking L.L.S. with a belt. He also admitted to the candle punishments and to "roughhousing" with the girls to the extent that they were "tickled a little too much" and that "[L.L.S.] just peed herself." Sorto admitted having "sleepovers" with the girls and acknowledged his statements in the controlled phone calls. He admitted that he made L.L.S. drink dog food. But Sorto denied sexually abusing L.L.S. and M.L.S., and he denied planting the hidden camera in M.L.S.'s room. Sorto admitted to his internet searches regarding ultrasounds

and the legality of recording conversations. But he explained that a doctor had recently recommended he have an ultrasound.

On cross-examination, the Commonwealth questioned whether Sorto had a scheduled ultrasound and asked if he brought his medical records to court. Sorto thereafter attempted through Soriano-Morales to admit a copy of his medical record, which she had printed out from his patient portal, to prove he had an appointment in late May 2023 for an ultrasound. The Commonwealth objected on the basis that the document contained hearsay and was not properly authenticated. Sorto responded that Soriano-Morales authenticated the document by testifying that she printed it directly from his patient portal and suggested that was all that was necessary to authenticate the document. The trial court found that the medical record was "not a referral" and sustained the objection. Sorto asked for a sidebar and further argued that the medical record was admissible under the medical diagnosis exception to the hearsay rule and that Soriano-Morales properly authenticated it. The Commonwealth responded,

> This is not an authenticated document. In order to authenticate, Defense Counsel is already onto the hearsay portion but we're on the authentication portion. We would need a custodian of record or a certificate of authenticity. This could have been created and printed by anyone. . . . it could be a false document. There is nobody here in court to authenticate this document. [Soriano-Morales], who is on the stand, cannot authenticate this document because she didn't create this document. She didn't store this document, and secure this document as a part of regularly conducted activity.

The trial court sustained the objection and did not admit the medical record.

Upon the conclusion of the evidence, and following closing arguments, the jury convicted Sorto of two counts of rape, forcible sodomy, aggravated sexual battery, and taking indecent liberties with a minor by someone in a custodial relationship. This appeal followed.

ANALYSIS

Standard of Review

"Generally, the admissibility of evidence is within the discretion of the trial court and we will not reject the decision of the trial court unless we find an abuse of discretion." *Midkiff v. Commonwealth*, 280 Va. 216, 219 (2010). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "In evaluating whether a trial court abused its discretion, . . . 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (alteration in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

To that end, "[a] reviewing court can conclude that an abuse of discretion occurred only when reasonable jurists could not differ about the correct result." *Howard v. Commonwealth*, 74 Va. App. 739, 753 (2022). To the extent this analysis requires interpretation of "statute[s] or the Rules of the Supreme Court, these are questions of law . . . review[ed] de novo." *Commonwealth v. Herring*, 288 Va. 59, 66 (2014) (quoting *Woodard v. Commonwealth*, 287 Va. 276, 280 (2014)).

Sorto challenges three different evidentiary rulings made by the trial court. First, he argues that the trial court erred by admitting evidence of his prior bad acts against L.L.S. and M.L.S.

Second, he contends that the trial court erred by excluding his medical record as not having been properly authenticated. And third, Sorto maintains that the trial court erred by admitting the statement he made to Detective Czekaj, "I rather just shut up." We address each in turn.[5]

## I. Prior Bad Acts

"Except as provided in Rule 2:413[6] or by statute, evidence of other crimes, wrongs, or acts is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith." Va. R. Evid. 2:404(b). In other words, "evidence 'tend[ing] to show that the accused is guilty of other crimes and offenses at other times' is not admissible if 'offered merely to show [the accused's] propensity to commit' the charged crime." *Harvey v. Commonwealth*, 76 Va. App. 436, 475 (2023) (alterations in original) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 714-15 (2008)).

> However, if the legitimate probative value of such proof outweighs its incidental prejudice, such evidence is admissible if it tends to prove any relevant fact pertaining to the offense charged, such as where it is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan.

Va. R. Evid. 2:404(b). Moreover, evidence of other offenses is admissible "if it shows the conduct and feeling of the accused toward his victim, if it establishes their prior relations, or if it tends to prove any . . . element of the offense charged." *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970). In other words, Virginia follows an "inclusionary approach" by "admitting [other-crimes

---

[5] Sorto's brief includes a fourth assignment of error alleging that the trial court erred by admitting his Amazon records showing that he purchased the camera found in M.L.S.'s bedroom; however, his brief contains no argument pertaining to that assignment of error and instead expressly states that the matter is "waived." Thus, we do not consider it.

[6] Rule of Evidence 2:413 provides, "In a criminal case in which the defendant is accused of a felony sexual offense involving a child victim, evidence of the defendant's *conviction* of another sexual offense or offenses is admissible and may be considered for its bearing on any matter to which it is relevant." (emphasis added).

evidence 'if relevant[] for any purpose *other than* to show a mere propensity.'" *Harvey*, 76 Va. App. at 476 (alterations in original) (quoting *Castillo v. Commonwealth*, 70 Va. App. 394, 415 (2019)).

Nevertheless, such evidence is admissible only if its "legitimate probative value . . . exceed[s] its incidental prejudice" to the accused. *Kenner v. Commonwealth*, 299 Va. 414, 427 (2021) (quoting *Rose v. Commonwealth*, 270 Va. 3, 11 (2005)). That is, "[r]elevant evidence may be excluded if:"

> (a) the probative value of the evidence is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact; or
>
> (b) the evidence is needlessly cumulative.

Va. R. Evid. 2:403. Thus, "when 'determining whether relevant evidence should be admitted, the trial court must apply a balancing test to assess the probative value of the evidence and any undue prejudicial effect of that evidence.'" *Commonwealth v. Proffitt*, 292 Va. 626, 639 (2016) (quoting *McCloud v. Commonwealth*, 269 Va. 242, 257 (2005)).

"Under this balancing test, relevant evidence will only be excluded when its probative value is 'substantially outweighed' by its *unfair* prejudice." *Id.* (emphasis added) (quoting Va. R. Evid. 2:403(a)(i)). "The fact that some prejudice may result does not justify automatic exclusion." *Mayfield v. Commonwealth*, 59 Va. App. 839, 849 (2012) (quoting *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 196 (1987)). "Indeed, '[a]ll evidence tending to prove guilt is prejudicial to an accused.'" *Id.* (alteration in original) (quoting *Powell v. Commonwealth*, 267 Va. 107, 141 (2004)). "Virginia law . . . intervenes only when the alleged prejudice tends to inflame irrational emotions or leads to illegitimate inferences. And even then, it becomes a matter of degree." *Thomas v. Commonwealth*, 44 Va. App. 741, 758, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005). In

the end, the responsibility for balancing probative versus prejudicial value "rests with the sound discretion of the trial court." *Harvey*, 76 Va. App. at 479; *see* Va. R. Evid. 2:404(b).

Sorto contends that the trial court abused its discretion by admitting evidence of his prior bad acts, first because the prior bad acts were "too different" from the offenses for which he was on trial, and second, because the trial court did not conduct the appropriate "probative . . . versus prejudicial" balancing test under Rule of Evidence 2:403.  Sorto thus concludes that the evidence was only useful to prove his "bad character" and by extension, his mere propensity to commit the charged offenses.  On this record, we disagree.  The prior bad acts evidence was relevant and admissible, not only to prove certain material elements of his custodial indecent liberties conviction, but to explain L.L.S.'s delayed report and to show that Sorto embarked on a common scheme or plan leading directly to his sexual offenses against L.L.S.

### A.  Two types of prior bad acts

#### i.  Acts of grooming, manipulation, and control sufficient to prove the custodial relationship over L.L.S. and to explain her delayed report

Sorto first maintains that the proof of his disciplinary methods was irrelevant and inadmissible as "prior bad acts" evidence, because it was merely useful to prove his "bad character." True enough, the evidence showed that when left regularly in Sorto's care, the girls were subjected to manipulative and punishing behaviors that were clearly intended to scare the girls into showing "respect" for Sorto and submit to his authority.  And such mistreatment certainly had that effect. But the evidence also showed that his punishments were used to maintain secrecy about the sexual abuse he perpetrated upon them.  The record indicates that Sorto's prior bad acts included evidence of "grooming."  White testified that "grooming" is a "process commonly seen within child abuse but specifically, child sexual abuse where a[n] offender will groom or manipulate a child really to kind of prepare them."  The verb "groom" means to "to get into readiness for some specific objective." *Groom*, *Webster's Third New International Dictionary* (1981).  It means "to train or

- 13 -

develop (a person) for a particular purpose." *Groom*, *Webster's New Universal Unabridged Dictionary* (1972).[7]

White testified that one of the phases of grooming is to create a pattern of manipulation and control that desensitizes the child, prevents disclosure, encourages secrecy, and normalizes the abuse. White also explained that patterns of grooming may come in the form of "threats, force, coercion, [and] gift giving," and said that family pets could also be used in a way to coerce or manipulate the child into the secrecy and desensitization of the act. She added that offenders often abuse multiple children living within the same household and that if the offender is losing access to one child due to that child getting older or leaving home, the offender may start to groom or manipulate a younger child within the house. In this case, the evidence of Sorto's prior bad acts was relevant and admissible to show that Sorto engaged in just such grooming behaviors here.

In fact, the evidence showed that Sorto made the girls clean the house while hopping around on one leg, he made them hold a wax candle warmer in their outstretched arm for at least an hour causing their arms to hurt, he made L.L.S. drink a cup of water mixed with dog food, he once struck L.L.S. with a belt at least ten times, and he made the girls pick up dog feces during the hottest time of the day. He regularly lied to Segovia about the girls' failure to do chores, and both girls testified that Sorto gave them "bear hugs," painfully squeezing them until they urinated. All these controlling "punishments" were clearly intended to demoralize the girls, invoke fear, and break down their sense of normalcy and safety so he could sexually assault

---

[7] See also *Baughman v. Commonwealth*, No. 0346-18-4, slip op. at 4 (Va. Ct. App. Dec. 17, 2019) (Expert testimony established that "'grooming' is the 'methodology' by which a sex offender 'establish[es] relationships with minors for the purpose of establishing a sexual relationship,' which typically involves 'befriending and establishing [an] emotional connection with a child or . . . the child's family in order to gain trust and lower the inhibitions of the child for sexual gratification.'" (alterations in original)).

them.  The evidence was also useful to explain their delay in reporting the abuse.  In fact, both girls testified that they were afraid of Sorto and thought he might harm them or break up the family if they told anyone about his sexual advances.  Thus, the fact that these punishments were not sexual in nature did not render them irrelevant.  While they were clearly indicative of his "bad character," they were also probative of Sorto's efforts to groom the girls and debase their inhibitions.  Thus, the trial court did not err in admitting the evidence.

### ii.  Prior sexual abuse against M.L.S.

The evidence also showed that upon achieving a sufficient level of control, Sorto began sexually abusing both girls during his organized "sleepovers."  Sorto argues that the offenses he committed upon M.L.S. were not similar enough to the offenses he committed against L.L.S. to warrant their admission.  But the evidence showed that Sorto first sexually abused M.L.S. by touching her vagina, her breasts and her buttocks and only stopped because she was old enough to demand that he do so.  Sorto also touched L.L.S. on her breasts and buttocks but then escalated his sexual abuse by using the time he had alone with L.L.S. after school to engage in sexual intercourse and forcible sodomy.  The evidence proved he "groomed" her into submission by offering her fun "surprise[s]" if she would go to the bedroom with him, threatening to take things away from her if she did not, suggesting he might kill Billy Bob, and by giving her food and sweets while simultaneously withholding food from M.L.S.

On this evidence, we find unavailing Sorto's assertion that his sexual abuse of M.L.S. was not similar enough to the abuse endured by L.L.S. to warrant its admission at trial.  His abuse of M.L.S. was relevant to prove a "common scheme or plan" to sexually abuse both girls, the nature of his relationship with L.L.C., and his lascivious intent.[8]  Va. R. Evid. 2:404.

---

[8] "Lascivious intent" is a material element of the offense of taking custodial indecent liberties with a child.  *See* Code § 18.2-370.1.

The terms "common scheme" and "common plan" are not synonymous. *Brooks v. Commonwealth*, 73 Va. App. 133, 142 (2021). A "'[c]ommon scheme' describes crimes that share features idiosyncratic in character, which permit an inference that each individual offense was committed by the same person or persons as part of a pattern of criminal activity involving certain identified crimes." *Id.* at 142-43 (quoting *Scott v. Commonwealth*, 274 Va. 636, 645 (2007)). "The possible range of idiosyncratic features that may prove a 'common scheme' is very broad." *Id.* at 143. "However, the Commonwealth's evidence regarding idiosyncratic features must permit an inference of a pattern of criminal activity by the same person; mere general similarities common to all offenses of the same type are insufficient." *Id.* "A common *plan* is established 'when the constituent offenses occur sequentially or interdependently to advance some common, extrinsic objective.'" *Id.* at 144 (emphasis added) (quoting *Severence v. Commonwealth*, 67 Va. App. 629, 646 (2017)). "A common plan requires the acts to be related to one another for the purpose of accomplishing a particular goal." *Id.*

Thus, while not synonymous, common schemes and plans "also are not mutually exclusive; a series of crimes may exhibit both a common scheme and a common plan." *Id.* at 142. "Accordingly, although a common scheme and a common plan are distinctively different, it is possible for the same set of facts to meet both definitions." *Id.*

In *Cheripka v. Commonwealth*, 78 Va. App. 480, 492 (2023), Jeffrey Cheripka was charged with sexually abusing two of his daughters, B.C. and E.C. Before trial, Cheripka moved to exclude E.C.'s testimony during his trial on the charges related to his abuse of B.C. *Id.* Cheripka argued that E.C.'s testimony constituted inadmissible prior bad acts evidence and that its probative value was outweighed by its unfair prejudice. *Id.* The trial court denied the motion, finding that the probative value of E.C.'s testimony was not outweighed by its prejudice and that

it was admissible as evidence of "a common plan or scheme and evidence of sexual abuse with a similarly situated child." *Id.*

At trial, E.C. testified to similar types of incidents of abuse to what B.C. had endured. *Id.* at 490-92. As with B.C.'s case, E.C. stated that Cheripka began abusing her when she was eight years old, that he removed her pants and made her sit on his lap, that he soon started penetrating her vagina with his fingers, and that he tried to have sex with her. *Id.* at 492. As with B.C., Cheripka's conduct toward E.C. occurred when the girls were travelling for soccer tournaments, and as with B.C., he told E.C. she would go to jail if she told anyone about the abuse. *Id.* at 492-93. Both girls testified that they often had to perform sexual acts with Cheripka for food. *Id.* at 491-93. Cheripka was convicted on two counts of object sexual penetration for his crimes against B.C. *Id.* at 493.

On appeal, Cheripka argued that the trial court abused its discretion by allowing E.C. to testify about his alleged prior bad acts against her and contended that E.C.'s testimony served no purpose other than to prove his propensity to commit sexual offenses. *Id.* at 494. He also asserted that E.C.'s testimony did not corroborate B.C.'s testimony because the methods of the alleged abuse were "completely different." *Id.*

This Court disagreed and found that "'in a prosecution for incest, evidence of acts of incestuous intercourse between the parties . . . , whether prior or subsequent thereto, is, if not too remote in point of time, admissible' to demonstrate 'the relations of the parties and the incestuous disposition of the defendant toward the other party.'" *Id.* at 496 (alteration in original) (quoting *Moore v. Commonwealth*, 222 Va. 72, 77 (1981)). This Court added that "[e]ven when the prior sexual abuse was committed against *another victim*, evidence of the abuse may be admissible to demonstrate a defendant's common motive, method, plan, or scheme, particularly 'in prosecutions for crime involving a depraved sexual instinct.'" *Id.*

(quoting *Commonwealth v. Minor*, 267 Va. 166, 176 (2004)). That is so, because "[a]cts showing a perverted sexual instinct are circumstances which with other circumstances may have a tendency to connect an accused with a crime of that character." *Id.* (quoting *Minor*, 267 Va. at 176).

This Court then opined, "[t]hat rationale for admitting the evidence applies with equal force in a circumstance where, as here, a defendant is prosecuted for incest against two daughters of similar age living in the same household." *Id.* That is, "[w]hen the two daughters provide substantially similar testimony that describes the defendant's same pattern of abuse, each daughter's testimony has significant probative value of demonstrating the defendant's incestuous disposition toward his daughters and that his offenses against both were 'inspired by one purpose.'" *Id.* (quoting *Moore*, 222 Va. at 77).

Sorto's case is not an "incest" case, but the same reasoning applies. As in *Cheripka*, M.L.S.'s testimony describing Sorto's sexual abuse "was highly probative of the nature of [his] relationship" with both M.L.S. and L.L.S. and "established the parallel conduct of his abuse with both girls." *Id.* at 497. As in *Cheripka*, M.L.S. and L.L.S. were siblings in the same household and close in age. And as in *Cheripka*, Sorto concocted "elaborate schemes" to hide the true nature of his abuse. *Id.* Particularly, Sorto "groomed" both girls through punishments intended to cause their submission and silence before inviting both girls to his organized "sleepovers." Sorto then first abused M.L.S., the older sister, by touching her breasts and buttocks, and by penetrating her vagina with his fingers. When she told him she no longer wanted "cuddle time or any of that," he began touching L.L.S. on her breasts and buttocks. That he added rape and forcible sodomy to his offenses against L.L.S. did not render his sexual offenses against M.L.S. irrelevant or inadmissible. Rather, all the evidence was probative of Sorto's grooming process,

his sexually deviant tendencies, the nature of his relationship with L.L.S., and his lascivious intent.

It follows that, because the evidence of Sorto's sexual abuse of M.L.S. was relevant to prove a common scheme or plan in his trial for the offenses he committed against L.L.S., it was admissible.

### B. Probative versus prejudicial balancing test

Sorto asserts that even if the prior bad acts evidence was admissible, the trial court failed to apply the appropriate balancing test. The record does not support that assertion. Both parties raised that prong of the analysis during the hearing on the matter, and both parties argued their respective positions on whether the evidence was more prejudicial than probative. By admitting the evidence and ordering a limiting instruction for the jury, the trial court implicitly held that the evidence was more probative than prejudicial, and we find no error in that ruling.[9]

"The trial court's rulings come to us with a presumption of correctness . . . [because it] is presumed to know and correctly apply the law 'absent clear evidence to the contrary in the record.'" *Cornelius v. Commonwealth*, 80 Va. App. 29, 47 (2024) (alterations in original) (quoting *Rainey v. Rainey*, 74 Va. App. 359, 377 (2022)). Moreover, Sorto was not entitled to have his abusive history "sanitized" from the record so as to "deny the jury knowledge of all but the immediate crime[s]" for which he was on trial. *Kenner*, 299 Va. at 426-27 (quoting *Scott v. Commonwealth*, 228 Va. 519, 526 (1984)). The evidence was, of course, prejudicial. But on this record, and for reasons already addressed herein, the trial court did not abuse its discretion in finding that its probative value outweighed its prejudicial nature, particularly because the Commonwealth was required to prove

---

[9] The court instructed the jury that it could only consider Sorto's prior bad acts as evidence of his motive, intent, knowledge, and scheme or plan "as evidenced by his conduct and feelings toward" L.L.S. or as "evidence of [his] incestuous disposition or lascivious intent toward L.L.S in connection with the offense for which he is on trial and *for no other purpose*." (Emphasis added).

Sorto's lascivious intent to prove custodial indecent liberties and because this case involved various sexual offenses against a child victim.

In sum, the evidence of Sorto's sexual abuse of M.L.S. and his excessive punishments, manipulations, and control over both girls were highly relevant and probative of the nature of his relationship with L.L.S. and the common motive, method, plan, or scheme he used to gain access to, and sexually abuse her. The evidence was also relevant and probative of his custodial or supervisory relationship with the girls and Sorto's lascivious intent, both of which are elements of the offense of taking indecent liberties with a minor. Because the evidence was relevant and admissible, and because its probative value outweighed any prejudice to the accused, the trial court did not abuse its discretion by admitting it at trial.

## II. Sorto's Medical Records

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended as an assertion." Va. R. Evid. 2:801(a). "A 'declarant' is a person who makes a statement." Va. R. Evid. 2:801(b). "Hearsay is not admissible except as provided by these Rules, other Rules of the Supreme Court of Virginia, or by Virginia statutes or case law." Va. R. Evid. 2:802. One of the exceptions to the hearsay rule include "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Va. R. Evid. 2:803(4). To that end, "[b]usiness records, including medical records, are admissible as an exception to the hearsay rule, '*provided there is a circumstantial guarantee of trustworthiness*.'" *Arnold v. Wallace*, 283 Va. 709, 713 (2012) (emphasis added) (quoting *Smith v. Commonwealth*, 280 Va. 178, 183 (2010)).

"The requisite trustworthiness or reliability of the hearsay statements in the documents . . . is guaranteed by a showing of:"

> the regularity of [the documents'] preparation and the fact that the records are relied upon in the transaction of business by the person or entities for which they are kept and they are kept in the ordinary course of business made contemporaneously with the event by persons having the duty to keep a true record. The final test is whether the documents sought to be introduced are the type of records which are relied upon by those who prepare them or for whom they are prepared.

*Id.* (second alteration in original) (quoting *Smith*, 280 Va. at 183-84). Thus,

> In any proceeding where a business record is material and otherwise admissible, authentication of the record and the foundation required by subdivision (6) of Rule 2:803 may be laid by (i) witness testimony, (ii) a certification of the authenticity of and foundation for the record made by the custodian of such record or other qualified witness either by affidavit or by declaration pursuant to Code § 8.01-4.3, or (iii) a combination of witness testimony and a certification.

Va. R. Evid. 2:902(6)(a). And in turn, any "record of acts, events, calculations, or conditions" are "not excluded by the hearsay rule" if:

> (A) the record was made at or near the time of the acts, events, calculations, or conditions by—or from information transmitted by— someone with knowledge;
>
> (B) the record was made and kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making and keeping the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 2:902(6) or with a statute permitting certification; and
>
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Va. R. Evid. 2:803(6).

Here, Sorto apparently tried to admit his medical record to show that he searched "quest labs ultrasound price," "chantilly walney rd doctors office," and "patient.questdiagnostics.com/estimate," not to help L.L.S. secure an abortion as the Commonwealth believed, but because his doctor had referred him for a sonogram. He argues that the evidence was admissible under the medical diagnosis exception to hearsay. But even if the document contained relevant and admissible information under the medical diagnosis exception to the hearsay rule, the governing rules of evidence require that the medical record itself still had to be properly authenticated before it could be admitted. Sorto failed in that burden.

Soriano-Morales testified that she printed the medical record from Sorto's patient portal. But even were we to accept that, her testimony merely established that she printed the document that was stored in his patient portal and that the document she brought to court was what she printed. Contrary to Sorto's assertion, that evidence fell far short of proving the document was what it purported to be because Sorto failed to establish that Soriano-Morales was a qualified witness for purposes of authenticating his medical record and, by extension, establishing the reliability of any assertions contained within it.

Soriano-Morales herself did not prepare the document, she was not familiar with the operations of the facility or its policies on the making and keeping of records, she was not a custodian of the records, and she had no personal knowledge that the document itself was a true reflection of Sorto's medical history. She merely alleged that she printed it from a patient portal. The bar for admissibility of a medical record is not set that low. *See McDowell v. Commonwealth*, 48 Va. App. 104, 110 (2006) (observing that "[c]omputer printouts, like business records, are admissible *if* the custodian or other qualified witness *is available to testify as to manner of preparation, reliability and trustworthiness*" (emphases added) (quoting *Jackson v. State*, 877 So.

2d 816, 817 (Fla. Dist. Ct. App. 2004)). Soriano-Morales's testimony fell far short of the legal standard for certifying medical records.

Moreover, without the proper certification, it was anyone's guess as to who created the document and whether the assertions contained within the report were accurate and true. And because the document contained hearsay, its admission at trial, without the proper certification and notice to the Commonwealth for purposes of cross-examination, would have resulted in unfair prejudice to the Commonwealth. It follows that because the medical record was not properly authenticated, it was inadmissible, and the trial court did not err by excluding it at trial.[10]

## III. Sorto's Adoptive Admissions

Lastly, Sorto challenges the trial court's admission of the statement he made to Detective Czekaj at the end of their conversation about his purchase of the Amazon camera, specifically, his assertion that "I rather just shut up." Sorto maintains that his statement referenced his right to remain silent and, therefore, that by allowing the jury to consider his statement, the trial court violated his constitutional right to remain silent. Upon review of the record, we find that even if the

---

[10] Sorto's reliance on the Virginia Supreme Court's decision in *Walters v. Littleton*, 223 Va. 446 (1982) does not alter our analysis. In that personal injury case, the trial court ruled that Walters's medical bills were inadmissible at trial upon a finding that Walters "was not a 'proper witness to admit' the bills." *Walters*, 223 Va. at 449. The Supreme Court reversed that ruling because "[w]hat Walters was prepared to offer as a witness . . . did not involve matters *beyond the scope of his knowledge or experience*" where Walters had been permitted to testify to the "nature and extent of his injuries, how he received them, and where, how, when and by whom he was treated." *Id.* at 450 (emphasis added). The Supreme Court found that the "probative value in showing Walters' damages did not depend upon an out-of-court assertion, but upon Walters' assertion, based on an adequate foundation." *Id.* The Supreme Court concluded that because Walters was only called upon to testify to the fact that he had received the medical bills as a consequence of the accident, and because the bills were "consistent with his testimony as to his injuries and treatment," the trial court erred by refusing to admit them. *Id.* at 451-52. The facts in the instant case are distinguishable. Here, Sorto tried to admit medical records in a criminal case through his fiancée that were clearly beyond Soriano-Morales's knowledge or experience, and about which she had no personal involvement.

- 23 -

trial court abused its discretion by admitting the statement at trial, any error in that ruling was harmless.

In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court of the United States held that the Fourteenth Amendment's Due Process Clause prohibits "the use for impeachment purposes of [defendant's] silence, at the time of arrest and after receiving *Miranda* warnings." *Id.* at 619 (citing *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966)); *accord Caprino v. Commonwealth*, 53 Va. App. 181, 185 (2008). Accordingly, the prosecution may not reference a defendant's "post-arrest, post-*Miranda* warnings silence" during witness examination or in closing argument to impeach the defendant. *Robinson v. Commonwealth*, 14 Va. App. 91, 93 (1992) (quoting *Durant v. Commonwealth*, 7 Va. App. 454, 460 (1988)). In this case, the trial court admitted Sorto's statement as an adoptive admission and the jury was allowed to consider it. The Commonwealth then referenced the statement more than once during closing arguments. Sorto thus asserts that his right to a fair trial was impinged and disputes that the alleged error was harmless.

"Constitutional error, like other types of error, remains subject to analysis under the doctrine of harmless error." *Commonwealth v. White*, 293 Va. 411, 420 (2017) (quoting *Foltz v. Commonwealth*, 284 Va. 467, 472 (2012)); *see also* Code § 8.01-678 (mandating harmless error review in all cases). "The proper inquiry for constitutional harmless error is 'whether the [jury] *would have* returned the same verdict absent the error.'" *White*, 293 Va. at 421-22 (quoting *Washington v. Recuenco*, 548 U.S. 212, 221 (2006)). "[W]hether such an error is harmless in a particular case depends upon a host of factors," including the "importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points . . . and . . . the overall strength of the prosecution's case." *Crawford v. Commonwealth*, 281 Va. 84, 101 (2011) (second, third, fourth, and fifth alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S.

673, 684 (1986)). Other factors relevant to harmless error analysis include "[t]he use to which the prosecution puts the postarrest silence," "[w]ho elected to pursue the line of questioning," "[t]he intensity and frequency of the reference," and whether the trial court provided "curative instructions." *Williams v. Zahradnick*, 632 F.2d 353, 361-62 (4th Cir. 1980).

In this case, Sorto made the statement "I rather just shut up" in response to Detective Czekaj's assertion that he purchased the Amazon camera. The Amazon camera was only a small part of the prior bad acts evidence and at best peripheral to the sex offenses. In fact, Detective Czekaj did not ask Sorto about the sexual offenses, and his statement "I rather just shut up," did not refer to them. Moreover, we find that even absent any reference to the Amazon camera and Sorto's refusal to discuss it, the evidence of Sorto's sexual abuse of L.L.S. was overwhelming. L.L.S. testified in detail about Sorto's sexual abuse and her testimony was corroborated by the other prior bad acts evidence, White's expert testimony, M.L.S.'s testimony, and even by Sorto's own conversation with L.L.S. during the controlled phone call. Thus, Sorto's unwillingness to say anything more about the camera had, at best, only a minimal effect on the evidence as a whole, and we can only conclude that the jury *would* have returned the same verdicts absent the alleged error. Because any error in the trial court's admission of the statement was harmless, we will leave Sorto's convictions undisturbed.

CONCLUSION

For the foregoing reasons, we find no abuse of discretion in the trial court's evidentiary rulings and affirm the judgment.

*Affirmed.*